Opinion
 

 HASTINGS, J.
 

 Introduction
 

 Defendant and appellant James S. Hamada, M.D. (Hamada) and plaintiff and respondent G. Karlin Michelson, M.D. (Michelson), both of whom practice orthopedic surgery, entered into several agreements providing that Hamada would share his office facilities with Michelson and provide certain billing and other services through his office personnel in exchange for payment. Michelson came to believe that Hamada was diverting moneys due Michelson for professional services rendered to patients, and he filed a complaint alleging breach of contract, breach of fiduciary duty, and fraud,
 
 *1575
 
 among other causes of action. By special verdict, the jury found in favor of Michelson. The jury awarded damages of $140,000 for breach of contract, $500,000 for breach of fiduciary duty, and $500,000 for fraud. The jury further found that compound prejudgment interest should be assessed. In a separate phase of the trial, the jury awarded $1,250,000 in punitive damages.
 

 After discharging the jury, the trial court ordered a total of $500,000 in actual damages, plus prejudgment interest “at the legal rate,” which it determined was 10 percent, compounded, and postjudgment interest at 10 percent. It denied Hamada’s motions for judgment notwithstanding the verdict, new trial and remittitur.
 

 Hamada contends: that the damages awarded were duplicative, thus requiring a new trial; that the cause of action for breach of fiduciary relationship was improperly allowed to go to the jury; that the trial court failed to instruct the jury properly regarding burden of proof on fraud; that the prejudgment interest rate was incorrectly determined; that the decision to award compound interest was not within the province of the jury; that the court improperly instructed on the burden of proof relating to punitive damages; and that the punitive damage award must be reversed as excessive. Michelson cross-appeals and contends: that the trial court erroneously reduced the actual damages by $140,000; erred in refusing to submit his claim for conversion to the jury; deprived him of additional damages to which he was entitled; and erroneously computed the prejudgment interest.
 

 We modify the judgment and order that it reflect the jury award of $140,000 for breach of contract damages; remand the matter for recalculation of prejudgment interest with respect to both the rate and the commencement date; and remand for further proceedings relating to punitive damages. We affirm the judgment in all other respects.
 

 1.
 
 Fiduciary relationship.
 

 The trial court denied Hamada’s motion for nonsuit with respect to the cause of action for breach of fiduciary duty, On appeal, Hamada contends that Michelson grounded his claim of breach of fiduciary duty on the contractual relationship between the parties, and on that basis, as a matter of law, no fiduciary relationship was created. We conclude that there was sufficient evidence to support a conclusion that a fiduciary relationship existed because Hamada and his professional corporation became the agents of Michelson and his professional corporation with respect to the handling of
 
 *1576
 
 Michelson’s accounts and collection of the proceeds those accounts engendered.
 
 [1]
 

 “The existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence. [Citation.]” (L.
 
 Bryon Culver & Associates
 
 v.
 
 Jaoudi Industrial & Trading Corp.
 
 (1991) 1 Cal.App.4th 300, 305 [1 Cal.Rptr.2d 680].) Inferences drawn from conflicting evidence by the trier of fact are generally upheld.
 
 (Brokaw
 
 v.
 
 Black-Foxe Military Institute
 
 (1951) 37 Cal.2d 274, 278 [231 P.2d 816].) We now review the facts established at trial.
 

 Michelson received surgical honors while in medical school. After completing his education and training in 1980, he learned that Hamada was interested in finding an associate skilled in spinal surgery, an area in which Michelson had trained and excelled. Hamada indicated to Michelson that he had built his office to accommodate two physicians and was looking for someone to help with his extremely heavy caseload, assist him during surgery, and enable him to accept referrals from other doctors, emergency room cases, and spinal surgery patients. Hamada indicated he believed that such an association would enable him to have more influence at the hospital.
 

 Michelson had not been in business before he met Hamada. He informed Hamada he was interested in a “turnkey” operation; that is, he would devote his time to the practice of orthopedic surgery and wanted to have no responsibilities for administering the business aspects of the practice. Hamada agreed and informed Michelson he was very proud of his office operations, which had been designed by a professional management team and which his wife oversaw to her satisfaction. Hamada indicated that a team of accountants reviewed all operations.
 

 On February 24, 1980, Hamada presented Michelson with a written agreement, which Michelson signed, and which memorialized some of the working arrangements they had agreed upon orally.
 

 In pertinent part, the document stated that Hamada’s professional corporation agreed to perform bookkeeping, billing, and collection services for Michelson, “including completing and filing of all medical insurance forms and other forms, and all follow-up procedures for collecting delinquent accounts.” It provided that, for the receipt of these services and the use of the premises and equipment, Michelson would pay 50 percent of the first $120,000 of the collections generated by his professional services during the
 
 *1577
 
 term of the agreement. The agreement could be terminated at any time by either party by notice to the other. Michelson’s payments to the corporation were to be made on the last day of each calendar month based on the amount collected on the Michelson accounts during that month, but because the corporation had agreed to perform the billing and collection services for Michelson, it would deduct his payment to the corporation from the collections received on his accounts and remit to him the difference on the last day of each calendar month.
 

 The agreement continued: “Corporation shall at all times keep at its medical offices, full, true and accurate records and books of accounts showing all of your billings and collections.” The agreement stated that “[Michelson] shall not have the right or power to exercise any management function concerning Corporation, or to take part in the control of Corporation’s business and you shall have no authority to bind the Corporation,” although Michelson’s suggestions concerning the operation of the medical practice of the corporation would be welcome.
 

 Within a month of becoming an associate of Hamada, Michelson was working 14 to 16 hours a day. Either Hamada or his wife wrote Michelson a check on the Hamada corporation account at the end of each month. At that time, Michelson had not incorporated his practice, and his only business records were the check registers for his personal checking account. Michelson did not involve himself in the management of the practice.
 

 About October of 1980, Michelson requested that his billings be sent to his patients under his name rather than under Hamada’s name because some patients had indicated they were confused regarding who had performed the surgery. Hamada agreed and his employees began to send bills in Michelson’s name, collect funds on those accounts, and make deposits directly to Michelson’s bank account.
 

 Because of the change in billing procedure, Hamada and Michelson renegotiated the agreement. A document dated February 2, 1981, provided that the Hamada corporation would perform billing and collection services for Michelson and that Michelson would have no part in the management of the corporation. The fee was set at $11,000 a month, to be renegotiated every six months. The agreement stated that, “for convenience, Corporation shall be permitted to subtract the amount of fees owed by you hereunder from the amount of such collections owed to you and that only the difference shall be remitted by Corporation to you.” Either party could terminate the agreement by giving a four-week written notice.
 

 After the new agreement became effective, Michelson performed no accounting or bookkeeping functions other than the maintenance of a check
 
 *1578
 
 register for the corporate bank account for his newly formed professional corporation.
 

 In the latter half of 1981, Hamada referred to a document, which he described to Michelson as a “summary” he used to keep track of Michelson’s and his own accounts. Hamada commented that Michelson’s practice was doing very well and that he was proud of him. Michelson asked to look at the document, thought it was “pretty neat,” and asked if he could be given one each month. Hamada agreed.
 

 Michelson’s belief was that Hamada was watching out for his interests and ensuring that the staff handled each of their respective accounts with the same concern. Michelson noticed that the accountant came to the office every month and that he frequently had an assistant with him. Michelson believed that the accountant was monitoring his accounts as well as those of Hamada. He did not learn otherwise until 1985.
 

 Based on Hamada’s representations of increased office expenses and Michelson’s flourishing practice, the payment to Hamada’s corporation eventually rose to $15,000 a month in February 1985.
 

 In August 1982, Hamada hired Marilyn Hammer. Beatrice Bamboa, Hamada’s office manager, assigned Hammer to collect Michelson’s accounts. Hammer also worked on Hamada’s accounts. Over time, Hammer discovered serious irregularities in the billing and handling of Michelson’s accounts and reported them to Bamboa. Little action was taken, and Hammer came to believe that Bamboa was not responding adequately to her concerns. In December 1983, Hammer brought the matter to Michelson’s attention and showed him several accounts and other documents. Michelson was shocked and expressed his belief that there was some mistake. He asked Hammer to explain the problems step by step. Michelson telephoned Hamada at home in disbelief. Hamada asked for the documentation and assured him that any problems would be resolved.
 

 When Hammer returned to work after the holidays, she learned from Michelson that he had conferred with Hamada and believed Hamada was very concerned. Michelson informed her that an accountant might be brought in to resolve the problems. Hammer was aware that Hamada received a daily adding machine tape which itemized every payment received for both doctors.
 

 In Hamada’s office, in the presence of Bamboa, Hamada informed Michelson that he was firing Hammer because she was incompetent and a
 
 *1579
 
 disruptive influence in the office. When Michelson, based on what Hammer had explained to him, asked to see some substantiation, Hamada indicated there was nothing to see because Hammer was not competent to read and interpret the documentation.
 

 Michelson considered Hamada to be his trusted friend, and his only fear was that Bamboa was misleading Hamada. Michelson took home one of three duplicate sets of computer discs that he believed contained patient records and other financial information, thinking he might prevent Bamboa from tampering with office records. When Hamada learned that Michelson had taken the discs, he demanded their return, refused to give Michelson a hard copy on the basis that the discs contained information regarding the practice before Michelson had become an associate, and offered only to have his own accountant review the information. After Michelson insisted that an accountant who had handled his tax returns be involved, evidence indicating that Michelson had not received income due him and had been overcharged in other matters gradually came to light.
 

 Civil Code section 2295 states: “An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency.” Any person may be authorized to act as an agent, including an adverse party to a transaction. (See
 
 Naify
 
 v.
 
 Pacific Indemnity Co.
 
 (1938) 11 Cal.2d 5, 7 [76 P.2d 663, 115 A.L.R. 476];
 
 Orfanos
 
 v.
 
 California Insurance Co.
 
 (1938) 29 Cal.App.2d 75, 78-81 [84 P.2d 233]; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 33, p. 47.) “Whether a person performing work for another is an agent. . . depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the alleged agent. [Citations.]”
 
 (Malloy
 
 v.
 
 Fong
 
 (1951) 37 Cal.2d 356, 370 [232 P.2d 241].) An agent
 
 is
 
 a fiduciary.
 
 (Kennard
 
 v.
 
 Glick
 
 (1960) 183 Cal.App.2d 246, 250-251 [7 Cal.Rptr. 88] [agent entrusted with duty of receiving and disbursing moneys and keeping accurate records of the transactions];
 
 Estate of Arbuckle
 
 (1950) 98 Cal.App.2d 562, 569-570 [220 P.2d 950, 23 A.L.R.2d 372] [business manager unable to produce will entrusted to him]; 2 Witkin, Summary of Cal. Law,
 
 supra,
 
 Agency and Employment, §§ 41, 43 et seq., pp. 53, 55.) Agency may be implied from the circumstances and conduct of the parties (see
 
 Bergtholdt
 
 v.
 
 Porter Bros. Co.
 
 (1896) 114 Cal. 681, 685-688 [46 P. 738];
 
 Brand
 
 v.
 
 Mantor
 
 (1935) 6 Cal.App.2d 126, 130 [44 P.2d 390];
 
 Pollack
 
 v.
 
 Lytle
 
 (1981) 120 Cal.App.3d 931, 940 [175 Cal.Rptr. 81];
 
 Brea
 
 v.
 
 McGlashan
 
 (1934) 3 Cal.App.2d 454, 464 [39 P.2d 877].) When the principal in reliance on the agent does not have the service performed by others, the agent is liable for failure to perform. (See Lab. Code, § 2851;
 
 Poile
 
 v.
 
 Stockton Merchants Assn.
 
 (1959) 176 Cal.App.2d 100, 104 [1 Cal.Rptr. 284,
 
 *1580
 
 76 A.L.R.2d 1151] [collection agency liable for amount of check it failed to collect and was under duty to inform principal of failure]; Rest.2d Agency, § 378; 2 Witkin, Summary of Cal. Law,
 
 supra,
 
 Agency and Employment, § 62, p. 68.) A contract between parties that includes the rendering of services does not preclude recovery for breach of a confidential relationship where property is misappropriated.
 
 (Agair Inc.
 
 v.
 
 Shaeffer
 
 (1965) 232 Cal.App.2d 513, 517 [42 Cal.Rptr. 883].)
 

 The written agreements disclose an agency relationship. The agreements stated that the Ramada corporation would perform billing and collection services for Michelson. Thus, the Ramada corporation represented Michelson in dealings with third persons, his patients. Under the first agreement, the Ramada corporation promised to keep available “full, true and accurate records and books of accounts showing all of your billings and collections.” Under both agreements Michelson had the right to terminate the relationship merely by giving the specified notice. Thus, Michelson could “fire” his agents should he become dissatisfied with the servicing of his accounts. “The power of the principal to terminate the services of the agent gives him the means of controlling the agent’s activities. ‘The right to immediately discharge involves the right of control.’ [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship. [Citation.]” (Ma
 
 lloy
 
 v.
 
 Fong, supra,
 
 37 Cal.2d at p. 370.) We conclude that under the agreements Michelson retained the legal right to control the activities of Ramada and the corporation in their role as his agents.
 

 The circumstances and conduct of the parties reflect their acceptance of the agency relationship set out in the agreements. The record supports the inference that Michelson was inexperienced in managing a medical practice and otherwise possessed little business acumen.
 
 [2]
 
 Michelson’s checking accounts, into which the Ramada corporation deposited checks for amounts it determined were due him, his check registers, and Ramada’s purported monthly summaries were the only financial records of his practice in his possession. This fact is indicative of Michelson’s reliance on Ramada and his corporation. Ramada encouraged reliance by repeatedly expressing pride and confidence in the business organization of the practice and discouraging any participation in management by Michelson. The fact that when Hammer attempted to warn Michelson of his vulnerability he immediately notified Ramada and, when told that Hammer was incompetent, concluded that
 
 *1581
 
 Bamboa could be misleading Ramada indicates the complete trust he reposed in Ramada. “Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. . . . [Citations.]”
 
 (Estate of Cover
 
 (1922) 188 Cal. 133, 143 [204 P. 583]; see also
 
 Pierce
 
 v.
 
 Lyman
 
 (1991) 1 Cal.App.4th 1093, 1101-1102 [3 Cal.Rptr.2d 236];
 
 Nicholson
 
 v.
 
 Rose
 
 (1980) 106 Cal.App.3d 457, 462 [165 Cal.Rptr. 156];
 
 Main
 
 v.
 
 Merrill Lynch, Pierce, Fenner & Smith, Inc.
 
 (1977) 67 Cal.App.3d 19, 31 [136 Cal.Rptr. 378];
 
 Stevens
 
 v.
 
 Marco
 
 (1956) 147 Cal.App.2d 357, 372 [305 P.2d 669].)
 

 Ramada cites several cases involving contractual relationships (e.g.,
 
 Love
 
 v.
 
 Fire Ins. Exchange
 
 (1990) 221 Cal.App.3d 1136 [271 Cal.Rptr. 246];
 
 Worldvision Enterprises, Inc.
 
 v.
 
 American Broadcasting Companies, Inc.
 
 (1983) 142 Cal.App.3d 589 [191 Cal.Rptr. 148];
 
 Rickel
 
 v.
 
 Schwinn Bicycle Co.
 
 (1983) 144 Cal.App.3d 648 [192 Cal.Rptr. 732];
 
 Waverly Productions, Inc.
 
 v.
 
 RKO General, Inc.
 
 (1963) 217 Cal.App.2d 721 [32 Cal.Rptr. 73];
 
 Wilson
 
 v.
 
 Zorb
 
 (1936) 15 Cal.App.2d 526 [59 P.2d 593]) and other relationships (e.g.,
 
 Thompson
 
 v.
 
 Cannon
 
 (1990) 224 Cal.App.3d 1413 [274 Cal.Rptr. 608] [insured and insurer];
 
 Frances T.
 
 v.
 
 Village Green Owners Assn.
 
 (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [landlord and tenant];
 
 Odorizzi
 
 v.
 
 Bloomfield School Dist.
 
 (1966) 246 Cal.App.2d 123 [54 Cal.Rptr. 533] [employer and employee]) held not to have given rise to a fiduciary duty. These cases are distinguishable on their facts in that they indeed involved nothing greater than a bare legal relationship. As set forth above, the matter before us goes beyond a mere contractual relationship.
 

 Ramada also asserts that appellants’ handling of Michelson’s funds created only a debtor-creditor relationship akin to a bank and its depositor, citing the rule that a debt is not a trust. The analogy fails. Rather, the facts in the instant case are closer to those of
 
 Nordin
 
 v.
 
 Eagle Rock State Bank
 
 (1934) 139 Cal.App. 584 [34 P.2d 490]. In
 
 Nordin,
 
 a bank president, who was not authorized by the bank to collect deposits, agreed to accept checks from Nordin off bank premises for deposit in Nordin’s account. The president was held to be the agent of Nordin in the performance of the service and liable for those amounts collected by him and never placed in possession of the bank.
 
 (Id.
 
 at pp. 591-592; see also
 
 Cooper
 
 v.
 
 Union Bank
 
 (1973) 9 Cal.3d 371, 382-383 [107 Cal.Rptr. 1, 507 P.2d 609] [ordinary agency transaction where agent receives funds intended for the principal does not give rise to bank debtor-creditor relationship at time of collection of proceeds];
 
 Van de Kamp
 
 v.
 
 Bank of America
 
 (1988) 204 Cal.App.3d 819, 859-860 [251 Cal.Rptr. 530];
 
 Ross
 
 v.
 
 Prudential Guar. Bldg. etc. Assn.
 
 (1934) 140 Cal.App. 148, 158-159 [35 P.2d 176].)
 

 
 *1582
 
 We conclude there was ample evidence to support both the presentation to the jury of the question whether a fiduciary relationship existed between the parties and the finding of its existence.
 

 In view of the above discussion, it is not necessary to determine Hamada’s contentions that the trial court erred in instructing the jury regarding fiduciary relationship, asserting there was no evidentiary support for that theory, and that the submission of the fiduciary duty claim infected both the fraud verdict and the jury’s finding that the action was timely filed.
 

 2.
 
 Jury instructions.
 

 Hamada notes that the trial court instructed the jury that Michelson bore the burden of proof with respect to the causes of action for breach of contract and breach of fiduciary duty but failed to state who bore the burden of proof with respect to the fraud cause of action. Hamada contends that such omission was prejudicial in that it led the jury to believe that he bore the burden, requiring reversal. Even if Hamada were correct in his contention, it would not affect the result in this case.
 

 Recovery for damages based upon breach of fiduciary duty is controlled by Civil Code section 3333, the traditional tort recovery. This is actually broader in some instances than damages which may be recovered for fraud.
 
 (Liodas
 
 v.
 
 Sahadi
 
 (1977) 19 Cal.3d 278, 283-284 [137 Cal.Rptr. 635, 562 P.2d 316];
 
 Pepitone
 
 v.
 
 Russo
 
 (1976) 64 Cal.App.3d 685, 688-689 [134 Cal.Rptr. 709].) Also, punitive damages are appropriate for a breach of fiduciary duty.
 
 {Stokes
 
 v.
 
 Henson
 
 (1990) 217 Cal.App.3d 187, 197-198 [265 Cal.Rptr. 836].) Because we have determined that breach of fiduciary duty was an appropriate theory upon which recovery was based, the damages awarded based upon that cause of action are at least equal to, if not more than those allowed for fraud. The court appropriately merged the damages for both fraud and breach of fiduciary duty and appellants suffered no harm from any misinstruction on the theory of fraud.
 

 3.
 
 Award of actual damages.
 

 As noted in the Introduction,
 
 ante,
 
 the jury found that Michelson had suffered actual damages of $140,000 as a result of breach of contract, $500,000 as a result of breach of fiduciary duty, and $500,000 as a result of fraud. The trial court ordered a total award of $500,000 as reflected in the judgment. Hamada contends that the special verdicts were irreconcilable in that they were based on identical conduct, and therefore a new trial on damages is required. Michelson cross-appeals on the issue of reduction of the judgment by the $140,000 breach of contract award.
 

 
 *1583
 
 With regard to the two amounts of $500,000 each for breach of fiduciary duty and fraud, as we have previously noted, the court appropriately reduced the judgment to reflect one single amount of $500,000 because the damages would be the same based upon Civil Code section 3333. However, we find the trial court erred in reducing the judgment by the sum of $140,000 because those damages are supported by evidence separate from that supporting the award relating to breach of fiduciary duty.
 

 Michelson moved to vacate and enter a different judgment which would include an award of $140,000 as contract damages separate from the $500,000 tort damage award. In denying the motion, the court stated: “Mr. Perry [Michelson’s expert witness] testified that in going through the accounting, he could find some documentary support that there was $140,000 in lost money, and that based on his analysis as an expert, he projected a total loss of $500,000. That is what he testified to, at least that is what I heard him testify to, and that is what the jury heard and they believed him. [ftj They believed that there was a $500,000 loss, so they came in with a verdict for $500,000.” We conclude that the trial court did not accurately recall the testimony of Perry, an unfortunate circumstance which led it into error. There is substantial evidence in the record to support the jury finding of separate, contractual damages.
 

 Separate items of compensable damage are recoverable when shown by distinct and independent evidence, whether the amounts are reflected in a single verdict or multiple verdicts referring to different claims.
 
 (Tavaglione
 
 v.
 
 Billings
 
 (1993) 4 Cal.4th 1150, 1159 [17 Cal.Rptr.2d 608, 847 P.2d 574]; see
 
 Pat Rose Associates
 
 v.
 
 Coombe
 
 (1990) 225 Cal.App.3d 9, 20 [275 Cal.Rptr. 1], disapproved on other grounds in
 
 Adams
 
 v.
 
 Murakami
 
 (1991) 54 Cal.3d 105, 116 [284 Cal.Rptr. 318, 813 P.2d 1348], [recovery of out-of-pocket loss under fraud theory and lost profits under contract theory permissible where damage items were distinct and entire amount of injury was compensable under fraud theory in any event].) In reviewing the jury’s finding of contract damages, we must determine whether it was free from prejudicial error and supported by substantial evidence, and whether the damages “were based on separate items of compensable damage so as to justify aggregating them in computing the total amount of the judgment.”
 
 (Tavaglione
 
 v.
 
 Billings, supra, 4
 
 Cal.4th at p. 1159.)
 

 Perry testified that his sampling of hundreds of files made available by Hamada established a total of $154,727.01 in lost income from March 31, 1981, forward, due to misapplication of Michelson’s fees to Hamada’s account, improper billing, entries in Michelson’s surgery log with no corresponding record crediting his account, and miscellaneous lapses and
 
 *1584
 
 omissions. Of the 262 files reflecting accounting irregularities, 121 of the incidents occurred during Michelson’s first full year of practice, ending March 31, 1981. During the 1982 fiscal year, there were 73 incidents. The remaining 68 cases were spread over the next two to three years. Extrapolating from these 262 cases, and the large quantity of data Mamada failed to produce, Perry estimated Michelson’s
 
 loss of income
 
 to be from $200,000 to $500,000. Perry’s analysis of summaries prepared by Mamada’s office led to the same estimate. The parties have not cited to nor have we found a damage figure of $140,000 produced by or testified to by Perry.
 

 With respect to damages suffered separate from the loss of income, the record reflects that the parties entered into a new agreement on February 14, 1985. The parties agreed that Michelson would pay $15,000 a month for office space, supplies and services.
 
 [3]
 
 The agreement was to be in force for a one-year period, at the end of which the fee could be redetermined based on documentation of the actual expenses of the office. Either party could terminate the agreement by giving notice in writing up to within 90 days prior to the end of the calendar year; that is, before October 1. There is evidence of at least three categories of expenditures in the record upon which the jury could have rested its award of $140,000 based upon Mamada’s unilateral breach of the terms of this agreement.
 

 First, Michelson testified that, during the period from about May 1985 until he moved to other offices in March 1986, Mamada refused to provide the previously agreed upon services and supplies in retaliation for Michelson’s insistence on an audit. As a result of this breach, Michelson had to pay a total of $69,924.69 to outside sources for these services and supplies. A schedule was introduced into evidence confirming these payments.
 

 Next, Michelson testified that in May 1985 Mamada gave him an eviction notice because Michelson had insisted upon payment of $200,000 as a result of the first audit. Over the next 10 months, Mamada exacted monthly increases of $4,000 to $7,000 above the $15,000 owed under the contract, ultimately reaching a total monthly payment of $31,000. Michelson testified that he paid the increases because Mamada continued to threaten to evict him and other suitable office space was unavailable. Assigning these three increases ($4,000, $7,000, $16,000) one month each, Michelson had to pay an additional $27,000 over what was owed for those three months. If we assume that the remaining seven months were averaged between $4,000 and $7,000, or $5,500, this is an additional $38,500. This is a total of $65,500 over the agreed upon contract price.
 

 Finally, there was further testimony that Mamada had deducted moneys from Michelson’s receipts for accounting services Michelson had not received for the five years prior to May 1, 1985.
 

 
 *1585
 
 “Where the
 
 fact
 
 of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.]”
 
 (GHK Associates
 
 v.
 
 Mayer Group, Inc.
 
 (1990) 224 Cal.App.3d 856, 873-874 [274 Cal.Rptr. 168].)
 

 The jury had before it evidence of damages that very closely approximated the $140,000 awarded: the additional payment of $69,924.69 for services and supplies; and the additional $65,500 above the agreed upon contract price. The two sums total $135,424.69. This sum is only $4,575.31 less than the amount awarded and does not include whatever the jury may have estimated as the amount paid for the accounting services Michelson never received prior to May 1, 1985. We have no way of knowing exactly how the jury calculated the ultimate amount; however, there is substantial evidence to support a breach of contract award of $140,000. It was error for the trial court to subsume this amount within the award of $500,000 for lost income.
 
 [4]
 

 4.
 
 Interest.
 

 Hamada contends that the trial court erred in ordering a prejudgment interest rate of 10 percent per annum and in instructing the jury it could determine whether to award compound prejudgment interest. On cross-appeal, Michelson contends that the trial court abused its discretion in determining the date on which interest commenced to accrue. We conclude that the applicable legal rate of prejudgment interest for the compensatory damages awarded under both the fraud and contract causes of action is 7 percent, that it was proper for the court to allow the jury to determine whether to award compound prejudgment interest, and that a different commencement date must be determined.
 

 Whether the proper interest rate was applied is a question of law.
 
 (Christiansen
 
 v.
 
 Roddy
 
 (1986) 186 Cal.App.3d 780, 789 [231 Cal.Rptr. 72].) There is no legislative act specifying the rate of prejudgment interest for a fraud claim, and therefore the constitutional rate of 7 percent applies to the $500,000 awarded as tort damages. (Cal. Const., art. XV, § 1;
 
 Continental Airlines, Inc.
 
 v.
 
 McDonnell Douglas Corp.
 
 (1989) 216 Cal.App.3d 388, 434
 
 *1586
 
 [264 Cal.Rptr. 779].) In addition, because the agreements entered into before 1986 did not stipulate a rate of interest chargeable after breach, the 7 percent rate also applies to the award of contract damages.
 
 (Id.
 
 at pp. 434, fn. 38; Civ. Code, § 3289, subd. (b); Cal. Const., art. XV, § 1.)
 

 Hamada argues that compound interest should not have been allowed because it is authorized solely in actions against trustees, citing cases involving defendants acting as fiduciaries
 
 (Estate of William Stott
 
 (1877) 52 Cal. 403;
 
 Wheeler
 
 v.
 
 Bolton
 
 (1891) 92 Cal. 159 [28 P. 558] [executor];
 
 Estate of Piercy
 
 (1914) 168 Cal. 755 [145 P. 91];
 
 West
 
 v.
 
 Stainback
 
 (1952) 108 Cal.App.2d 806 [240 P.2d 366] [trustee];
 
 Douglas
 
 v.
 
 Westfall
 
 (1952) 113 Cal.App.2d 107 [248 P.2d 68] [trustee];
 
 McNulty
 
 v.
 
 Copp
 
 (1954) 125 Cal.App.2d 697 [271 P.2d 90] [executor].) As we have previously discussed, Hamada stood in a fiduciary relationship with Michelson and the jury found that he breached his fiduciary duty. These cases confirm that an award of compound interest
 
 is appropriate
 
 in this type of case.
 

 Hamada next argues that only the trial court acting in equity, and not the jury, may award compound prejudgment interest. He relies upon the same six cases cited above. The facts of the six cases do, indeed, involve court trials. However, none of them purports to promulgate a rule that only the trial court can award such interest.
 

 Prejudgment interest pursuant to Civil Code section 3288
 
 [5]
 
 is awarded to compensate a party for loss of use of his or her property and is in the nature of damages. “The inclusion of interest in the verdict pursuant to section 3288 is not the granting of damages in excess of the loss incurred. When, by virtue of the fraud or breach of fiduciary duty of the defendant, a plaintiff has been deprived of the use of his money or property and is obliged to resort to litigation to recover it, the inclusion of interest in the award is necessary in order to make the plaintiff whole.”
 
 (Nordahl
 
 v.
 
 Department of Real Estate
 
 (1975) 48 Cal.App.3d 657, 665 [121 Cal.Rptr. 794].) It is always the trier of fact that determines the issue of damages and this is true with regard to prejudgment interest pursuant to section 3288.
 

 Section 3288 reads: “In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given,
 
 in the discretion of the jury.”
 

 [6]
 

 (Italics added.) This language has been construed to mean that the trier of fact, whether jury or
 
 *1587
 
 the court, appropriately decides the issue of prejudgment interest under this section. (See generally, 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1397, pp. 868-869.)
 

 In
 
 Conger
 
 v.
 
 White
 
 (1945) 69 Cal.App.2d 28, 40 [158 P.2d 415], the court held: “The
 
 jury
 
 included in its verdict interest at 7 per cent upon each of the sums paid by plaintiff from the date of payment to the time of trial. . . . The award of interest was proper under section 3288 of the Civil Code. . . . We are aware of no case in which it has been held improper to allow interest, where the recovery was for fraud, since the adoption of the original code section.” (Italics added.)
 

 Our Supreme Court in
 
 Bullís
 
 v.
 
 Security Pac. Nat. Bank
 
 (1978) 21 Cal.3d 801, 814 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642], held that section 3288 places the discretion for awarding prejudgment interest in the hands of the trier of fact. In
 
 Bullís,
 
 a jury had been waived and the court was the trier of fact. At footnote 16, the court states: “While section 3288 only grants such authority to the ‘jury,’ the trial court, when acting as the trier of fact, may award prejudgment interest under this section. (See, e.g„
 
 Nordahl
 
 v.
 
 Department of Real Estate[, supra,]
 
 48 Cal.App.3d [at p.] 665;
 
 Nathanson
 
 v.
 
 Murphy
 
 (1955) 132 Cal.App.2d 363, 373 [282 P.2d 174].)”
 

 More recently, in
 
 Stein
 
 v.
 
 Southern Cal. Edison Co.
 
 (1992) 7 Cal.App.4th 565 [8 Cal.Rptr.2d 907], the court cited
 
 Bullís
 
 and recognized that this discretion is vested in the jury, as compared to the court. In that case, plaintiff/appellant Stein argued in a posttrial motion that the trial court should entertain a request to award prejudgment interest against the defendant under section 3288. The trial court refused to do so. The appellate court held that it would have been improper for the trial court to entertain such a request stating: “We reject the Steins’ argument that the court should have granted prejudgment interest under section 3288. The Steins did not request interest under that section in a timely manner.
 
 Edison was entitled to have a jury determine prejudgment interest under section 3288 since it is an issue for the trier of fact. (Bullís
 
 v.
 
 Security Pac. Nat. Bank, supra,
 
 21 Cal.3d 801, 815.)” (7 Cal.App.4th at p. 572, italics added.)
 

 When the jury is the trier of fact, it is the jury which is vested with discretion to award prejudgment interest under section 3288, including compound interest. In
 
 Westbrook
 
 v.
 
 Fairchild
 
 (1992) 7 Cal.App.4th 889, 892 [9 Cal.Rptr.2d 277], the jury awarded compound prejudgment interest,
 
 *1588
 
 which was affirmed on appeal. The issue addressed in the published portion of the opinion was whether the trial court had discretion to order
 
 postjudgment compound interest.
 
 The court contrasted the authority of the court in this situation with the power of the jury regarding prejudgment interest pursuant to section 3288. It concluded the trial court has no inherent power to order postjudgment compound interest.
 

 In his cross-appeal, Michelson contends that the trial court abused its discretion when it deemed that the date upon which the jury found the statute of limitations commenced to run, December 31, 1983, as the date on which prejudgment interest began to accrue. We agree.
 

 “[I]t is proper to have such interest run from the time the plaintiff parted with the money or property on the basis of the defendant’s fraud.”
 
 (Nordahl
 
 v.
 
 Department of Real Estate, supra,
 
 48 Cal.App.3d at p. 665.) “The award of interest was proper under section 3288 of the Civil Code . . . .It should run from the date when the money was paid or the property lost, because the duty to compensate plaintiff for her losses arose then, and no demand was necessary.”
 
 (Conger
 
 v.
 
 White, supra,
 
 69 Cal.App.2d at p. 40.) The problem presented is determining exactly when the losses occurred, a point raised by Hamada.
 

 In the present case, James Perry, a certified public accountant who examined and analyzed the available records on behalf of Michelson, opined at trial that the revenue shortfall resulting from improper billing and collection practices totaled approximately $300,000 to $500,000. Perry calculated the shortfall for Michelson’s first two years of practice, ending March 31, 1982, as $234,000 to $424,000, and beyond that date, an additional $75,000. After the trial court discharged the jury, it noted the jury had determined that the statute of limitations commenced to run “December of 1983.” The court deemed the date to be December 31, 1983, and ordered compound interest on the compensatory damages award from that date.
 

 In
 
 Amador Valley Investors
 
 v.
 
 City of Livermore
 
 (1974) 43 Cal.App.3d 483 [117 Cal.Rptr. 749], discharged treated sewage damaged plaintiffs’ property “evenly and regularly” through the time of trial. The
 
 Amador
 
 court affirmed the trial court decision to commence the running of prejudgment interest approximately midpoint during the period. It noted the rule in condemnation cases and those involving damage to property that “. . interest should run from the date the damage is inflicted or at least from the commencement of suit.’ ”
 
 (Amador Valley Investors
 
 v.
 
 City of Livermore, supra,
 
 43 Cal.App.3d at pp. 494-495, quoting
 
 Heimann
 
 v.
 
 City of Los Angeles
 
 (1947) 30 Cal.2d 746, 759 [185 P.2d 597], overruled on other grounds in
 
 County of Los
 
 
 *1589
 

 Angeles
 
 v.
 
 Faus
 
 (1957) 48 Cal.2d 672, 679-680 [312 P.2d 680].) The December 31, 1983, commencement date for interest does not adequately compensate Michelson for the lost use of revenue siphoned off by Hamada. To remedy this, the calculation of the commencement date for interest is in two parts. First, interest on the $425,000 is to commence 12 months into the period of the first 24 months; second, interest on the $75,000 is to commence 101/2 months into the period of the remaining 21 months. With regard to contract damages, the award of interest is controlled by section 3287. The record indicates that the losses were more evenly distributed in that some services were never provided.
 
 Amador
 
 again provides guidance. A mid-period date appears reasonable to commence the running of interest. We shall remand this case to the trial court for recalculation.
 

 5.
 
 Conversion.
 

 Michelson contends in his cross-appeal that the trial court erroneously refused to submit his claim for conversion to the jury, depriving him of additional damages to which he was entitled. Michelson fails to cite the record for the arguments before the court or its ruling. In the absence of citation to appropriate portions of the record, we are not required to search the record to determine whether it supports his contention.
 
 (Guardians of Turlock’s Integrity
 
 v.
 
 Turlock City Council
 
 (1983) 149 Cal.App.3d 584, 600 [197 Cal.Rptr. 303];
 
 Green
 
 v.
 
 City of Los Angeles
 
 (1974) 40 Cal.App.3d 819, 835 [115 Cal.Rptr. 685].) In addition, Michelson fails to claim a specific, definite sum capable of identification to be recovered under his conversion theory. None of the authorities cited in his opening brief supports recovery in the absence of certainty. (See, e.g.,
 
 Haigler
 
 v.
 
 Donnelly
 
 (1941) 18 Cal.2d 674 [117 P.2d 331];
 
 Champion Home Builders Co.
 
 v.
 
 Sipes
 
 (1990) 219 Cal.App.3d 1415 [269 Cal.Rptr. 75].) We cannot evaluate the asserted error in the absence of this information and hold the issue waived.
 

 6.
 
 Request for additional consequential damages.
 

 Michelson contends in his cross-appeal, again without adequate citation to the record, that the trial court erred in not permitting him to prove to the jury, or otherwise recover, the following: $105,731.50 “to identify and reconstruct” the accounting records; $24,000 for Perry for “identifying and correcting errors” in Hamada’s billings and collections; and an undisclosed amount to a law student to assist in screening 7,000 files. His reply brief fills some but not all of the gaps. Again, there is no citation to the record with respect to the decision of the trial court. Scrutiny of the references Michelson does make in support of his argument shows that the charges were incurred in preparation for the instant litigation. Thus, they are not recoverable as consequential damages. (Code Civ. Proc., § 1033.5, subd. (b)(1) and (2).)
 

 
 *1590
 
 With respect to Perry, the reporter’s transcript discloses that he testified he had been retained as a consultant by counsel for Michelson to review the work of Marilyn Hammer, to express an opinion whether the work was competent, and to express an opinion regarding the amount of loss incurred by Michelson. Michelson’s counsel asked Perry to compute his billing “to yesterday.” Perry testified that the total of $24,300 included 154 hours of his time at $150, including 30 hours for depositions and 16 hours of court time. Michelson’s citation to the clerk’s transcript includes three billings by Perry which state that the services rendered were in connection with the litigation.
 

 Hammer’s time cards span the period from September 1986 to December 1989, long after there was any hope that such efforts would result in Hamada paying sums to Michelson under their agreements. The exhibit does include a January 3, 1990, one-page summary on Michelson’s letterhead that indicates he was paying Hammer as early as 1984, but the purpose of these payments is not indicated. The data for other individuals and firms listed thereon are incomplete with respect to dates, hours, or purpose. Michelson testified that the summary was a reasonable capitulation of the records his counsel had directed him to institute to document the time spent searching and analyzing the records.
 

 Michelson refers us to testimony by law student Funk. Funk testified she commenced working for Michelson’s counsel in 1989, first setting up a computerized accounting system and then working on the instant case by assisting Hammer in the review of some 7,000 files. The clerk’s transcript, cited by Michelson, indicates that Funk billed a total of $4,087.30 for services on “Michelson v. Hamada" and that she performed those services during the period April 12, 1989, through August 31, 1989, approximately two months before trial commenced. These expenditures are not “consequential damages” but may be addressed as costs or attorney fees under the appropriate circumstances.
 

 7.
 
 Punitive damages.
 

 Hamada contends that the jury award of $1,250,000 in punitive damages must be reversed because the trial court erred in that it failed to instruct the jury properly, admitted incompetent evidence, and precluded character evidence, and because the award was excessive as a matter of law. We agree with this last contention.
 

 a.
 
 Instruction of the jury.
 

 Hamada asserts that the punitive damage award must be reversed because the trial court failed to instruct the jury that Michelson bore the
 
 *1591
 
 burden of proof regarding evidence of Hamada’s financial condition, citing
 
 Adams
 
 v.
 
 Murakami, supra,
 
 54 Cal.3d 105, and that the omission confused the jury and prejudiced his case. Michelson responds that
 
 Adams
 
 merely assigns the burden of producing evidence of financial condition to plaintiffs and does not require the trial court specifically to instruct the jury that plaintiffs bear the burden of proving a defendant’s financial condition by a preponderance of the evidence.
 
 Adams
 
 appears to contain language supportive of both positions.
 
 (Id.
 
 at pp. 119-123, and see conc. opn. of Kennard, J., at p. 124.) However, it is unnecessary for us to decide this question because the record reflects that both requirements were satisfied in the instant case.
 

 Michelson shouldered the burden of producing evidence of Hamada’s financial condition by subpoenaing Stan Chortkoff, a certified public accountant who had worked for Hamada for about 13 years, to produce documentation of Hamada’s finances and testify regarding the data. The record also reflects that the trial court stated to the jury in the punitive damages phase of trial and before any evidence of Hamada’s financial condition was introduced: “As usual, the plaintiff goes first. The plaintiff has the burden of proof.” After the parties rested, the court stated: “All of the prior instructions, I won’t reread them, but if they have application, they also apply to this stage of the deliberations.” The court next instructed the jury regarding the measure of punitive damages (BAJI No. 14.72.2). We conclude that the jury was properly instructed and that Hamada suffered no prejudice.
 

 b.
 
 Competency of evidence.
 

 Chortkoff testified regarding two statements he had drafted based on Hamada’s records and other information supplied by the doctor. Both statements indicated that Hamada’s Bel Air Estates residence was valued at $3 million. Chortkoff indicated he had taken into consideration the rising real estate market and other factors. He testified he would have lowered the valuation but had followed Hamada’s opinion that the value of the property had remained unchanged.
 

 Michelson’s expert witness Perry testified regarding the differences in valuation of property and financial interests listed in Hamada’s two financial statements. Perry stated: “I also noticed that the personal residence in January, 1988 was valued at $3 million, and there was no change in that valuation between the 18-month period between June of ’88 and December of ’89, which I find to be unusual given the significant increase in the real estate market.” Hamada objected that no foundation had been established to permit Perry to give an opinion regarding the value of the property. The trial
 
 *1592
 
 court overruled the objection on the basis that Perry was testifying about something that was considered to be common knowledge. We do not necessarily agree that this is an area of common knowledge. However, we find no harm because we agree that the award was excessive and we remand the matter to the trial court.
 

 c.
 
 Character evidence.
 

 Michelson objected that expected testimony regarding Hamada’s character was irrelevant and immaterial to the issue of the amount of punitive damages that should be imposed in a bifurcated civil case. The trial court agreed, stating: “[Tjhere is no claim in this case of any conduct other than within a business relationship in office sharing, so that even if [the relation of the proposed character evidence to the factor of deterrence under BAJI No. 14.72.2] were reasonable, which I don’t think it is, the only deterrence you would be talking about is deterring from billing practices in a medical practice. That would have nothing to do with one’s reputation in the street or one’s charity or good works or any of that sort. It has nothing to do with anything, except how you keep your books and whether or not you are cheating your partner. That is really all there is to it.” The court also determined that the admission of such evidence would be immaterial and result in an undue consumption of time, obviously taking into account the provisions of Evidence Code section 352.
 
 [7]
 

 Hamada contends that the evidence was relevant on the question of what amount would deter him from future misconduct. Hamada concedes that no California case has so held. We decline Hamada’s invitation to broaden the scope of admissibility of character evidence in this case. In addition, the evidence supports the trial court’s exercise of discretion pursuant to Evidence Code section 352.
 

 d.
 
 Amount of award.
 

 Finally, Hamada contends that the punitive damage award of $1,250,000 was excessive as a matter of law in light of his financial
 
 *1593
 
 condition and his conduct. The purpose in awarding punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts.
 
 (Neal
 
 v.
 
 Farmers Ins. Exchange
 
 (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980].) An award should be no larger than the amount necessary to accomplish this purpose and therefore must be tailored to the defendant’s financié status.
 
 (Miller
 
 v.
 
 Elite Ins. Co.
 
 (1980) 100 Cal.App.3d 739, 759-760 [161 Cal.Rptr. 322].) “[A]n appellate court may reverse such an award only when the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. [Citation.]”
 
 (Neal
 
 v.
 
 Farmers Ins. Exchange, supra,
 
 21 Cal.3d at p. 928, internal quotation marks omitted.) Factors to be considered include the nature of the acts of the defendant and the wealth of the defendant.
 
 (Id.
 
 at p. 928.) We review the evidence in some detail.
 

 The two financial statements drafted by Chortkoff indicated that as of June 30,1988, Hamada’s net worth was $4,394,500 and that as of December 31, 1989, Hamada’s net worth had declined to $2,080,633. Chortkoff testified as follows:
 

 The 1989 statement, prepared in response to Michelson’s subpoena, reflected values after deduction of projected income taxes from sale of the assets, based on the assumption that such sale would be necessary to satisfy the judgment. The 1988 statement had been prepared as part of a loan application to a bank and did not include tax liabilities.
 

 With respect to Hamada’s interest in limited partnerships, their value in 1988 was $112,000, a fair market value; their value in 1989 was minus $43, a “book value” that might or might not represent fair market value.
 

 Hamada’s “personal effects” were valued in 1988 at a fair market value of $250,000; in 1989, at a fair market value of $100,000. Chortkoff did not have information to account for the $150,000 decrease.
 

 The market value of the Bel Air Estates residence was $3 million on both statements. A Laguna Beach house and condominium were valued at a total of $950,000 on the 1988 statement; in 1989, at $1.1 million. Hamada’s “Manhattan Beach property,” “Laguna Hills property,” and “Lawndale property” had been depreciated and the values listed were book values. There was no indication of fair market value on the statements. The Laguna condominium was a second home. The others were income-producing properties. Hamada’s indebtedness on his real property holdings had increased by $450,000 during the 18-month period between the statements. Chortkoff did
 
 *1594
 
 not know what had happened to the $450,000 and testified: “You have the investments that I am aware of on these statements.”
 

 The “Comprehensive Spine Center,” a corporation Hamada owned with another physician and at which he saw patients, was listed as having zero book value on the 1989 statement. Chortkoff testified he believed that the zero value was also the fair market value and that some of the “$400,000” had been invested in the corporation. The center had suffered a loss the first year in business, had made a profit the second year, and its book value was then $700. Chortkoff agreed that its fair market value as far as its potential to earn profit was not reflected in the statements.
 

 An Inglewood office was listed on the 1989 statement with a book value of $700,000, reflecting accounts receivable of about $500,000, but valued at an after tax book value of $200,000. The statement listed the physical assets with a book value of about $200,000. Chortkoff had no opinion as to the fair market value of that operation.
 

 I-Protect, a company owned by Hamada, was listed in the 1989 statement as worth minus $189,000. Chortkoff testified Hamada had loaned the company as much as $300,000 that could not be recovered. According to Chortkoff, the corporation had suffered continuing losses. Hamada was personally liable on a note for $189,000, which was not reflected in the 1988 statement, as well as a $69,000 obligation for another company.
 

 Louis Ltd., listed on the 1988 statement, was no longer in business and Hamada’s investment was lost.
 

 Personal income was listed in the 1988 statement as $250,000 and in the 1989 statement as $100,000 based on Chortkoffs discussions with Hamada. Chortkoff calculated Hamada’s personal liability as $2.5 million to $3 million, including mortgages on the Bel Air Estates property, the two Laguna Beach properties, and the Lawndale property. Loans which could be called by the bank totaled about $600,000. Hamada had $30,000 cash in the bank as of December 31, 1989. Chortkoff had not included as a liability the damages awarded by the jury thus far. He had not calculated the fair market value of Hamada’s medical practice because he considered personal service entities to be unique and difficult to value for that reason.
 

 Chortkoff did not recall if Hamada’s net income from his medical practice had increased since 1986. Chortkoff testified he believed that Hamada had grossed $1.5 million or more in personal income since March 31, 1986, and in some years as much as $2 million. Chortkoff did not believe that
 
 *1595
 
 Hamada’s net profit had been above $1 million each year since March 31, 1986.
 

 Perry, Michelson’s accounting expert, testified and noted some differences between the two financial statements: James Hamada Inc., had been valued at $850,000 on the 1988 statement and $700,000 on the 1989 statement; I-Protect, $150,000, and then a negative $189,000; limited partnerships at $112,000 and then no value. It was Perry’s opinion that estimated income taxes on the sale of Hamada’s assets to satisfy the judgment should not be deducted in calculating his net worth because any damages paid in this case would be tax deductible, giving a net tax effect of zero. Perry noted that the two statements did not indicate the fate of the $450,000 by which the Hamadas had reduced the equity in their two homes during the eighteen-month period. Perry testified that the factors to be considered in determining the value of a professional medical practice include its accounts receivable, its assets, including equipment, furniture, and leasehold improvements, and its goodwill, which is “the value of the income stream that that practice generates.” Assuming that a medical practice such as Hamada’s corporation grossed approximately $2 million and netted over $1 million a year, goodwill would be evaluated by deducting amounts attributable to various risk factors and projecting the net income over a five-year period. Perry could not determine from the two statements how Hamada had reached a fair market value for his medical practice. Perry explained the difference between book value—cost to the taxpayer less any previous tax benefits—and fair market value—the value at which the asset can be sold in the open market.
 

 On cross-examination, Perry testified he would not guarantee that Hamada would be able to deduct damages awarded in this case from his income for tax purposes.
 

 The trial court referred to the 1989 financial statement as “patently crooked” and denied Hamada’s motion for new trial on damages or remittitur.
 

 Hamada argues that the punitive damage award was excessive when compared to either his net worth, as reflected by both financial statements, or his net income. Deterrence is a major goal of punitive damages. As the trial court noted, the jury had just awarded $500,000 in tort damages based on fraud and even that significant award had not deterred Hamada from mounting a defense that left more questions than answers. “The jury could have, and undoubtedly did, disbelieve [the] self-serving testimony. [Citation.]”
 
 (Moore
 
 v.
 
 American United Life Ins. Co.
 
 (1984) 150 Cal.App.3d 610, 641
 
 *1596
 
 [197 Cal.Rptr. 878].) Net worth, as has been recently noted, is subject to easy manipulation.
 
 (Lara
 
 v.
 
 Cadag
 
 (1993) 13 Cal.App.4th 1061, 1065, fn. 3 [16 Cal.Rptr.2d 811].) Given the paucity of evidence regarding Ramada’s net income since 1986 and the incredulity accorded the 1989 statement, it may be inferred that the jury based its award on the 1988 statement, which had been prepared for purposes other than trial. On that basis, the $1,250,000 award is 28 percent of the $4,394,500 net worth figure. We have found no case approving an award of this magnitude. A court of review must intervene when the award is so disproportionate as to raise the presumption that it was the product of passion or prejudice, even though deference is due a trial court’s approval of a punitive damage award.
 
 {Dumas
 
 v.
 
 Stocker
 
 (1989) 213 Cal.App.3d 1262, 1266 [262 Cal.Rptr. 311].) Punitive damages constitute a windfall.
 
 (Id.
 
 at p. 1266.) Such awards generally are not allowed to exceed 10 percent of the net worth of the defendant.
 
 (Storage Services
 
 v.
 
 Oosterbaan
 
 (1989) 214 Cal.App.3d 498, 515 [262 Cal.Rptr. 68].) We find the award to be excessive as a matter of law.
 

 Disposition
 

 The judgment is modified by adding $140,000 to reflect the jury award of actual damages for breach of contract. The matter is remanded for recalculation of prejudgment interest based on the legal rate of 7 percent and a redetermination of the amount of interest based upon the actual dates of loss as can be best determined. The punitive damage award against Ramada is vacated and the matter is remanded for the trial court to reconsider Ramada’s motion for remittitur but only as to punitive damages, or in the alternative for a new trial on the issue of punitive damages. The judgment is otherwise affirmed.
 

 Parties are to bear their own costs on appeal.
 

 Epstein, Acting P. J„ and Vogel (C. S.), J., concurred.
 

 A petition for a rehearing was denied November 17, 1994, and the petition of defendants and appellants for review by the Surpreme Court was denied January 19, 1995.
 

 [1]
 

 The respective professional corporations also are parties to this appeal.
 

 [2]
 

 Although appellants’ brief asserts there was evidence that Michelson was a registered stockbroker, those portions of the record cited reflect only that Michelson had indicated on a tax return that he had suffered substantial financial losses as a “stock trader.”
 

 [3]
 

 There is no indication of the breakdown of the amount for rent, supplies and services.
 

 [4]
 

 Appellants argue that references to jury interviews indicated that the jury took the figure of $69,924.69 and then doubled it, which appellants contend is improper. Information from jurors relating to their mental process during deliberation is improper and cannot be considered to impeach the verdict. (Evid. Code, § 1150;
 
 Continental Dairy Equip. Co.
 
 v.
 
 Lawrence
 
 (1971) 17 Cal.App.3d 378, 385-387 [94 Cal.Rptr. 887].) As long as substantial evidence before the jury supports the award, it must be affirmed.
 

 [5]
 

 All further references are to the Civil Code unless otherwise noted.
 

 [6]
 

 The language of this section must be contrasted with section 3287, subdivision (b) which grants discretion to the court, as compared to the jury. That section states: “(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in
 
 *1587
 
 contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.”
 

 [7]
 

 BAJI No. 14.72.2 (1989 re-rev.) reads as pertinent: “You must now determine whether you should award punitive damages against defendants], for the sake of example and by way of punishment. Whether punitive damages should be imposed, and if so, the amount thereof, is left to your sound discretion, exercised without passion or prejudice. [1] If you determine that punitive damages should be assessed against a defendant, in arriving at the amount of such an award, you must consider: [5] (1) The reprehensibility of the conduct of the defendant. [5] (2) The amount of punitive damages which will have a deterrent effect on the defendant in the light of defendant’s financial condition. [5] (3) That the punitive damages must bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff.”