Filed 6/14/22  Greenfield v. Kandeel CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| GREENFIELD LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>AYMAN KANDEEL et al.,<br><br>    Defendants and Appellants. | B297194<br><br>(Los Angeles County<br>Super. Ct. No. BC548794) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Dismissed in part and judgment vacated and remanded with directions.

Freedman + Taitelman, Bryan J. Freedman and Steven E. Formaker; Durie Tangri, Benjamin B. Au; Lewis Baach Kaufmann Middlemiss, Tara J. Plochocki, for Plaintiff and Appellant.

Shaw Koepke & Satter, Jens B. Koepke, for Defendants and Appellants.

# I. INTRODUCTION

Plaintiff and appellant Greenfield LLC (Greenfield)[1] brought an action against defendants and appellants Ayman Kandeel and AKCJ Management, Inc. (AKCJ) asserting causes of action for conversion, breach of fiduciary duty, common law fraud, and common law negligent misrepresentation.[2]  In a special verdict, the jury found in Greenfield's favor on its conversion claims against defendants and on its fraud and negligent misrepresentation claims against Kandeel.  On Greenfield's conversion claims, the jury awarded $20.3 million against Kandeel, $5.7 million of which it awarded jointly and severally against Kandeel and AKCG.  On Greenfield's fraud and negligent misrepresentation claims, it awarded $25 million against Kandeel.

Apart from its conversion, fraud, and negligent misrepresentation verdicts, the jury found that the al-Jarallahs could have avoided $25 million of the damages awarded against

---

[1]    On April 15, 2014, Jarallah al-Jarallah and his father Mohammed Nassar al-Jarallah (al-Jarallahs) assigned to Greenfield "all claims arising from their fraudulently induced investment of $78,200,000 against any and all responsible parties . . . and granted to Greenfield . . . the full power to collect, sue for, compromise, or in any other manner enforce collection thereof." When we refer to a member of the family, we use the first name for clarity.

[2]    The third amended complaint named several other defendants who are not parties to this appeal, some of whom we identify below as necessary for context.  The third amended complaint also asserted other causes of action against those defendants that are not at issue in this appeal.

Kandeel through reasonable efforts or expenditures. It also found that the al-Jarallahs had unclean hands. As to the al-Jarallahs' unclean hands, the jury found that it would not be unfair to award damages against the Pi Capital defendants,[3] but would be unfair to award damages against the JPMorgan defendants.[4]

The special verdict form required the jury to determine the Pi Capital defendants' and the JPMorgan defendants' unclean hands affirmative defenses before it addressed liability. Accordingly, based on its unclean hands findings, the jury rendered verdicts as to the Pi Capital defendants, but not as to the JPMorgan defendants.

In posttrial proceedings, the trial court awarded Greenfield $8,343,022 in prejudgment interest, $2,342,622 of which it awarded jointly and severally against Kandeel and AKCJ (i.e.,

---

[3]     For purposes of the trial, the trial court informed the jury that the designation "Pi Capital defendants" would refer to Kandeel and several companies affiliated with him:  Pi Capital; Pacific International Holding Group, Inc. (PIHG); Pi Capital/Borak GP, LLC; Pi Capital GP, LLC; Pi Capital Fund, LP; Middle Eastern Telecom International, Inc., also known Middle Eastern Telecommunications (METI); AKCJ; Pacific International Management Corporation, also known as Pacific International Management, Inc.; Pacific International Management III, LLC; I Need a Grand Productions, LLC; Pacific Med Trade, Inc.; AK Entertainment, Inc., doing business as AK Comics; and Pacific International Properties, LLC.

[4]     The trial court defined the "JPMorgan defendants" for the jury as:  JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; and J.P. Morgan Securities, formerly known as J.P. Morgan Securities, Inc.

prejudgment interest on the $5.7 million joint and several conversion verdict) and denied codefendant Pi Capital its attorney fees.

In its appeal, Greenfield contends the trial court erred in determining the date on which prejudgment interest began to accrue and there was no basis for the court's mitigation instruction or the jury's failure to mitigate finding. In their appeal, defendants contend the jury's special verdict findings on their and the JPMorgan defendants' unclean hands affirmative defenses were irreconcilably inconsistent, insufficient evidence supported the conversion verdicts because they were based on inadmissible hearsay financial records, and Greenfield lacked standing to pursue its conversion claims. Codefendant Pi Capital contends the court erred in failing to award it attorney fees.

## II.    BACKGROUND[5]

Jarallah was a member of a wealthy Saudi Arabian family. In 1999, he was an undergraduate engineering and economics student at the University of Southern California. He met Kandeel, an economics Ph.D. student and teaching assistant, in an economics department computer lab and they became friends.

---

[5]    Because Kandeel does not challenge the sufficiency of the evidence supporting the fraud and negligent misrepresentation verdicts, and defendants do not challenge the sufficiency of the evidence supporting the conversion verdicts except as to their claim that the verdicts were based solely on inadmissible hearsay financial records, we set forth a brief recitation of the facts for context and add facts below that are necessary to address the parties' claims on appeal.

While at USC, Jarallah started a company called Native Names which "had the technology for typing website addresses in different languages." Mohammad financed the company. Jarallah hired Kandeel as Native Names' director of business development. Jarallah was satisfied with Kandeel's performance and Mohammad was very satisfied with his investment in the company. Other successful business ventures involving Jarallah and Kandeel followed.

In 2004, Mohammad asked Jarallah to manage the family investment portfolio which, at that time, was worth from $800 million to $1 billion. That same year, Kandeel and a man named Steve Picciano approached Jarallah about managing some of the al-Jarallah family investments through an E-trade account. The al-Jarallahs allowed Kandeel and Picciano to manage $10 million for six months. At the end of six months, the account had earned a 20 percent return. Jarallah was very satisfied with Kandeel and Picciano's performance.

Thereafter, Kandeel suggested the formation of Pi Capital, a company that would oversee the al-Jarallahs' investments in the United States. Kandeel told Jarallah he had "managed a $270 million portfolio for ultra-high net worth individuals from Europe and the Middle East" and had served as the economic advisor to the Egyptian Minister of Industry.

Pi Capital was incorporated in January 2005. Jarallah served as Pi Capital's president and chairman, Kandeel served as chief executive officer and Picciano served as chief financial officer. The al-Jarallahs invested about $160 million with Pi Capital. After redemptions, their net investment was about $88 million.

5

The Saudi International Investment Company (SIIC) was formed "to meet the requirements of the Saudi financial market authorities to apply and acquire a brokerage license, a security brokerage license in the Kingdom of Saudi Arabia for Jarallah's company that he was establishing over there." In 2005, Jarallah authorized Pi Capital to invest $9 million in SIIC—$6 million was transferred on June 17, 2005, and $3 million on August 12, 2005. Shortly after those investments, Kandeel had $6 million transferred to his own bank account in two installments—$3 million on July 20, 2005, and $3 million on August 17, 2005.

METI was formed to invest in telecommunications technology projects. In 2005, Jarallah authorized Pi Capital to invest $15 million in METI. Kandeel had $8,603,438 transferred from METI to TEC Investments, a consulting company Kandeel formed to "run a business out of."

PIHG was formed to establish a bank in the United States. In 2005, Jarallah authorized Pi Capital to invest $42 million in PIHG—$24 million was transferred on October 25, 2005, and $18 million on November 22, 2005. Almost immediately after PIHG received the second of those transfers, Kandeel had $30 million transferred to his own bank account—$18 million on November 22, 2005, and $12 million on November 23, 2005. Later, Kandeel returned $5 million to PIHG for investment in banking projects. Kandeel invested the remaining $25 million in an Egyptian resort real estate venture called Al Forsan.

Sometime prior to September 30, 2006, PIHG loaned $5.7 million to AKCJ. The loan was reflected on PIHG's balance sheets as a loan receivable from an "Ayman Entity (TBD)." The loan was never repaid.

6

In 2007, the Saudi Arabian Capital Market Authority (CMA) investigated the al-Jarallahs for stock market manipulation. The CMA found them guilty, ordered them to disgorge their profits and imposed fines and sanctions. The trial court instructed the jury:

"You have heard that Mohammed Nasser [a]l-Jarallah, the father, and Jarallah [a]l-Jarallah, the son, have been convicted for stock market manipulation in Saudi Arabia. The proceedings resulting in these convictions were criminal in nature, not civil, and involved felonies.

"You were told about the convictions to help you decide whether you should believe these persons. You were also provided with this information to help you decide whether the [al-]Jarallahs have acted with unclean hands, to help you judge their credibility, and to rebut other contentions by Greenfield in this case, such as the extent of the [al-]Jarallahs' sophistication, the reasons why they authorized transfers out of the Pi Capital accounts at JPMorgan, and whether the [al-]Jarallahs are responsible for some or all of the damages Greenfield seeks here. You may consider this information for all of these purposes."

On January 15, 2013, in an e-mail response to a request for audited financial statements for Pi Capital, Kandeel stated, "There isn't really much to audit, after Pi Capital lost most of its accounts under management in 2005/2006." When Jarallah saw Kandeel's response, he was shocked and realized "the whole thing was just a scam."

# III.   DISCUSSION

A.   *Prejudgment Interest*

The parties stipulated that the jury would decide if Greenfield was entitled to prejudgment interest and the trial court would calculate the amount of any award.  The jury awarded Greenfield prejudgment interest on its conversion verdict, and the court calculated the amount of prejudgment interest owed at $8,343,022.  Greenfield contends the court abused its discretion in determining the dates on which prejudgment interest began to accrue.

"In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."  (Civ. Code, § 3288.)  Prejudgment interest accrues from the date the plaintiff lost its money due to the defendant's wrongful conduct. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1588.)  We review a trial court's determination of the date on which prejudgment interest began to accrue for an abuse of discretion. (*Ibid.*)

"'"'Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . .'"'  [Citation.]"  (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 650 (*IIG Wireless*).)  "'Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved . . . .'"  (*PCO, Inc. v.*

*Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395.)

In its posttrial motion, Greenfield argued that interest began to accrue on the $20.3 million conversion verdict as follows: on the $6 million Kandeel converted through the SIIC, interest began to accrue no later than August 17, 2005, based on SIIC's General Ledger showing two separate $3 million transfers on July 20 and August 17, 2005; on the $5.7 million defendants converted through PIHG, interest began to accrue no later than September 30, 2006, based on PIHG's September 30, 2006, balance sheet showing a loan receivable from an "Ayman Entity (TBD)" of $5.7 million—i.e., the $5.7 million AKCJ loan; and on the $8.6 million Kandeel converted through METI, interest began to accrue no later than December 31, 2006, based on METI's December 31, 2006, balance sheet showing an $8,603,438[6] investment in TEC.

The trial court found that Greenfield had submitted insufficient evidence to support its proposed dates for Kandeel's conversions. Unable to identify the exact dates of the conversions, the court turned to the "next best alternative"—the earliest date the evidence showed the conversions had already occurred. For that date, it used Jarallah's testimony about how upset he became when he learned from the January 15, 2013, e-mail that his family investment was lost.

At best, Greenfield showed that defendants transferred funds from various accounts on particular dates. Greenfield did not, however, adequately show with certainty the dates on which Kandeel and defendants wrongfully exercised dominion over the

---

[6]     Greenfield posits the jury rounded this figure down to $8.6 million.

9

al-Jarallahs' funds. Accordingly, it has failed to show that the trial court abused its discretion in selecting January 15, 2013, as the date on which interest began to accrue—i.e., that the court's selection was arbitrary and resulted in a manifest miscarriage of justice. (*Pilliod v. Monsanto Company* (2021) 67 Cal.App.5th 591, 630.)

B.    *Mitigation of Damages*

Greenfield contends the trial court erred in instructing the jury on mitigation of damages as to its fraud and negligent misrepresentation claims against Kandeel and the jury's finding that it failed to mitigate its damages was not supported by substantial evidence. We agree that the jury's finding was not supported by substantial evidence.[7]

1.    Standard of Review

"Mitigation of damages is a question of fact, and is subject to review for the existence of substantial evidence. [Citation.][Fn. omitted.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 875 (*OCM*).) ""'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light

_____

[7]    Because we hold that substantial evidence did not support the jury's finding, we need not address Greenfield's claim that the court erred in instructing the jury on mitigation of damages or Kandeel's claim that Greenfield forfeited its instructional error claim by failing to object to the mitigation instruction in the trial court.

10

most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.'" [Citation.]" (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.) "Substantial evidence is not "'synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value . . . ." [Citation.]' [Citation.]" (*OCM, supra*, 157 Cal.App.4th at p. 845.)

     2.    <u>Analysis</u>

"The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.' [Citations.]" (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691 (*Valle de Oro Bank*).) "'The rule of [mitigation of damages] comes into play after a legal wrong has occurred, but while some damages may still be averted . . . .'" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1066 (*Pool*); *Valle de Oro Bank, supra*, 26 Cal.App.4th at p. 1691 ["Typically, the rule of mitigation of damages comes into play when the event producing injury or damage has already occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts"].)

The jury awarded Greenfield $25 million on its fraud and negligent misrepresentation causes of action against Kandeel. It found, however, that the al-Jarallahs could have avoided the

11

entire $25 million in damages they suffered through "reasonable efforts or expenditures."

Greenfield moved for judgment notwithstanding the verdict or, alternatively, to set aside or vacate the jury's finding that the al-Jarallahs failed to mitigate their damages. It argued, in part, that Kandeel had presented no evidence about what the al-Jarallahs could have done to recover their money from Kandeel, when they could have done it, or what they could have recovered.

In opposition, Kandeel claimed that substantial evidence supported the jury's mitigation finding because the al-Jarallahs failed to audit or otherwise monitor their funds. He argued that "the jury could infer that if Jarallah simply had picked up the telephone, called Mr. Drew[8] in 2005 or 2006 and requested financial statements, Mr. Drew would have provided them and they would have showed the disposition of the $25 million at issue."

Further, Kandeel claimed that substantial evidence supported the jury's mitigation finding because the al-Jarallahs failed to establish common sense safeguards over their funds. He argued the al-Jarallahs could have required their money not be transferred to Egypt for the Al Forsan project without their knowledge and consent—e.g., by requiring an al-Jarallah signature for the transfer of funds.

Finally, Kandeel claimed that substantial evidence supported the jury's mitigation finding because the al-Jarallahs authorized the investment of their funds in the high-risk Al Forsan project.

The trial court ruled, "Kandeel cogently sets forth all the evidence that supports the jury's finding as to lack of

_____

8      Kirkwood Drew was PIHG's chief executive officer.

12

mitigation. . . . Given the jury's unanimous finding on this issue, the court declines to set it aside."

Kandeel's argument misperceived the doctrine of mitigation of damages. In effect, Kandeel's argument was that if the al-Jarallahs had been reasonably diligent, he would not have been able to defraud them of their money in the first place. The mitigation doctrine does not, however, concern an injured party's duty to avoid the tort in the first instance. Like here, when a party's tort results in damage to another, the injured party has a duty to mitigate or lessen the damages following and resulting from that tort. (*Pool, supra*, 42 Cal.3d at p. 1066 ["'The rule of [mitigation of damages] comes into play after a legal wrong has occurred . . .'"]; *Valle de Oro Bank, supra*, 26 Cal.App.4th at p. 1691 ["Typically, the rule of mitigation of damages comes into play when the event producing injury or damage has already occurred . . ."].) Kandeel makes the same failed argument on appeal.

Moreover, even though Kandeel identifies measures he claims the al-Jarallahs could have taken to mitigate their damages, he cites no evidence that those measures would have returned any of the al-Jarallahs' funds to them. "While substantial evidence may inevitably consist of inferences, they must be the result of logic and reason emanating from the evidence and not mere speculation or conjecture." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1283; *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1188 [speculation is not evidence].)

Accordingly, we reverse the trial court's denial of Greenfield's motion for judgment notwithstanding the verdict and remand this matter for the court to determine prejudgment

13

interest on the jury's fraud and negligent misrepresentation verdicts.

C.    *Unclean Hands Affirmative Defense*

The jury found in favor of the JPMorgan defendants on their unclean hands affirmative defense but against the Pi Capital defendants on their unclean hands affirmative defense. Kandeel argues that because the JPMorgan defendants and the Pi Capital defendants presented the same evidence and made the same arguments to the jury in support of their respective unclean hands affirmative defenses, the jury's findings are irreconcilably inconsistent and we must remand for a new trial. Greenfield argues that any inconsistency in the findings was not prejudicial because there was insufficient evidence to support the affirmative defense. We agree with Greenfield.[9]

1.    Standard of Review

"When an appellant contends the evidence is insufficient to support a judgment, order, or factual finding, we apply the

---

[9]    Because we hold that insufficient evidence supported the Pi Capital defendants' unclean hands defense, we need not decide Greenfield's contentions that Kandeel forfeited this issue and the jury's findings were not inconsistent. Our holding that insufficient evidence supported the Pi Capital defendants' unclean hands affirmative defense does not affect the JPMorgan defendants' verdict against Greenfield as Greenfield did not appeal from that part of the judgment or challenge on appeal the jury's findings as to the JPMorgan defendants' unclean hands affirmative defense.

14

substantial evidence standard of review. 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957 (*Cahill*).)

      2.    <u>Analysis</u>

"The defense of unclean hands arises from the maxim, ""He who comes into Equity must come with clean hands."" [Citation.] The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim. [Citations.] The defense is available in legal as well as equitable actions. [Citations.]" (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

"'The essence of the "clean hands" doctrine is not that the plaintiff's hands are dirty but "that the manner of dirtying renders inequitable the assertion of such rights against the defendant."' [Citation.] 'It is not every wrongful act, nor even every fraud, which prevents a suitor in equity from obtaining relief.' [Citation.] 'It is settled that the act upon which equity may refuse relief to a plaintiff because he does not come into court with clean hands must prejudicially affect the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief.' [Citation.] 'It must have been

15

conduct which, if permitted, inequitably affects the relationship between the plaintiff and the defendant.' [Citations.]" (*Martin v. Kehl* (1983) 145 Cal.App.3d 228, 239, fn. 1 (*Martin*); *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 283 (*Brown*) ["'If he [the wrongdoer] is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require.' (2 Pomeroy, A Treatise on Equity Jurisprudence (5th ed. 1941) § 399, p. 97; see *Bradley Co. v. Bradley* (1913) 165 Cal. 237, 242, . . . [citing Pomeroy and stating, 'His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief. . .']"]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 846 (*Mattco*) ["there must be a direct relationship between the misconduct and the claimed injuries"].)

The basis for the JPMorgan defendants' and the Pi Capital defendants' unclean hands affirmative defenses was the al-Jarallahs' conviction for stock manipulation in Saudi Arabia with funds allegedly withdrawn from their Pi Capital investments. As stated above, the trial court instructed the jury, "You have heard that Mohammed Nasser [a]l-Jarallah, the father, and Jarallah [a]l-Jarallah, the son, have been convicted for stock market manipulation in Saudi Arabia. The proceedings resulting in these convictions were criminal in nature, not civil, and involved felonies. [¶] . . . You were also provided with this information to help you decide whether the [al-]Jarallahs have acted with unclean hands . . . ."

The al-Jarallahs' unclean hands conduct—stock manipulation in Saudi Arabia—was neither directed at nor prejudiced Kandeel. Their stock manipulation was directed at

16

stock market investors who were harmed, not Kandeel. That conduct was separate from the al-Jarallahs' investments with Kandeel. Because the al-Jarallahs were "'not guilty of inequitable conduct toward'" Kandeel in their investment with him, their "'hands are as clean as the court can require.'" (*Brown, supra*, 192 Cal.App.4th at p. 283; *Martin, supra*, 145 Cal.App.3d at p. 239, fn. 1; *Mattco, supra*, 52 Cal.App.4th at p. 846; see also, *Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 445, quoting *Kendall-Jackson, supra*, 76 Cal.App.4th at p. 979 ["'The misconduct must ""prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief""'"]; 2 Schwing, Cal. Affirmative Defenses (2021) § 45:3 (2d ed.) ["courts have ruled that the party seeking to invoke the unclean hands doctrine must have been injured by the alleged wrongful conduct"].) Accordingly, insufficient evidence supported the Pi Capital defendants' unclean hands affirmative defense and any inconsistency in the jury's findings was thus not prejudicial.

D.  *Hearsay Evidence*

Defendants contend that insufficient evidence supported the conversion verdicts because the verdicts were based on hearsay financial records that were not admissible as business records under Evidence Code section 1271. Greenfield argues that defendants forfeited review of this issue because they did not object to the admission of the financial records on hearsay grounds and the records were admitted without limitation. We agree that defendants have forfeited review of this issue.

17

Katherine Orr worked as a bookkeeper for the accounting firm CohnReznick. Kandeel was a CohnReznick client. Orr provided bookkeeping services for Kandeel and his corporations. She was the bookkeeper for and prepared financial statements for SIIC, PIHG, and METI.

Greenfield's counsel examined Orr about Exhibit 1076, SIIC's December 31, 2007, balance sheet, profit and loss statements for 2005 through 2009, and general ledger. Orr testified that she prepared the documents in the ordinary course of her business working for an accounting firm. Greenfield's counsel asked that the exhibit be admitted into evidence. The trial court sustained defense counsel's foundation objection.

After further examination to establish Exhibit 1076's foundation, Greenfield's counsel asked the trial court to admit the exhibit into evidence. Defense counsel stated, "Same objection, Your Honor. Foundation." The court overruled the objection and admitted Exhibit 1076. The court subsequently sustained hearsay objections to questions about whether Exhibit 1076 showed that consulting fees were paid to Kandeel and whether Kandeel was paid $6 million in consulting fees.

Greenfield's counsel next questioned Orr about Exhibit 10, PIHG's September 30, 2006, balance sheet. Orr testified she prepared the balance sheet based on documents provided to her in her role as PIHG's bookkeeper. Greenfield's counsel asked the court to admit the exhibit into evidence. Defense counsel stated, "Same objection, Your Honor."

Outside the jury's presence, the trial court asked Greenfield's counsel if she intended to ask the same sort of questions about Exhibit 10 as she had asked about Exhibit 1076. Counsel responded that generally she did. Asked the basis for

18

his objection, defense counsel stated, "It's hearsay and it's—there's lack of foundation as well."

The trial court asked Greenfield's counsel if she intended to lay the same foundation as she had for Exhibit 1076. She said she did. Defense counsel stated that assuming Greenfield's counsel were to lay the same foundation and based on the court's earlier foundation ruling, defendants "would submit that the hearsay concern remains."

The trial court stated, "All right. Well, look, I agree with [defense counsel] that the witness can't tell us if, in fact, consulting fees were paid. That would be without her—beyond her personal knowledge. She could tell us what she inputted based on what she had in front of her, and then you could argue circumstantial evidence if that happened." Greenfield's counsel posited, "If we asked the question, does this document accurately reflect something, is that going to trigger a hearsay objection?" Defense counsel responded that it would.

The trial court stated, "All right. Look, I think I'll stick with my ruling. I might give a limiting instruction as to what all of these things mean in terms of what is being offered for the truth here, because there's an implication here that certain facts exist which she would not have personal knowledge of."

Greenfield's counsel sought clarification, asking the trial court if Orr could be asked "does this document accurately reflect [questions]? And you'll have an instruction on that and we can move forward?" The court said, "Yes," and asked Greenfield's counsel to prepare an instruction.[10]

After a break in Orr's testimony, Greenfield's counsel returned to Exhibit 1076, asking Orr to explain what an entry

---

[10]    The court did not give the jury a limiting instruction.

19

under "Consulting Expenses" identifying Kandeel reflected. Defense counsel interposed a best evidence objection that the trial court overruled. Orr then testified that Exhibit 1076 reflected that Kandeel had transferred $3 million on July 20, 2005, and again on August 17, 2005.

Greenfield's counsel then examined Orr further about Exhibit 10. She asked if Orr was PIHG's bookkeeper and if Orr maintained PIHG's balance sheet as part of her job as PIHG's bookkeeper. Orr answer, "Yes," to both questions. Greenfield's counsel again asked the trial court to admit Exhibit 10 into evidence. Defense counsel stated, "No objection, [Y]our Honor," and the court admitted the exhibit.

Greenfield's counsel asked Orr to explain what the entry "Ayman Entity TBD" under the "Loans Receivable" section reflected. Defense counsel interposed lack of foundation, best evidence, and hearsay objections. The trial court sustained the objections. After laying a further foundation, Greenfield's counsel asked if "there's $5.7 million going to Ayman Entity TBD." The court sustained defense counsel's objection to "going to," telling Greenfield's counsel to rephrase her question.

Greenfield's counsel asked Orr if there was a $5.7 million loan reflected in the "Loans Receivable" section of PIHG's balance sheet. Orr said there was. Greenfield's counsel asked if that loan "would have [been] made to the entities listed below." Orr responded that it would. Defense counsel objected on foundation and hearsay grounds. The trial court overruled the objections.

Greenfield's counsel also examined Orr about Exhibit 2631, METI's December 31, 2006, balance sheet. She asked if Orr was METI's bookkeeper and if Orr created METI's balance sheet using documents she received as part of her job as METI's

20

bookkeeper. Orr answered, "Yes," to both questions. Greenfield's counsel asked the trial court to admit Exhibit 2631 into evidence. Defense counsel stated, "No objection, [Y]our Honor," and the court admitted the exhibit. Orr then testified, without objection, that the "Other Current Assets" section in Exhibit 2631 reflected an investment in TEC of $8,603,438.[11]

Defendants argue that the PIHG, METI, and SIIC balance sheets were "the only evidence that purportedly showed the $20.3 million in funds going to Kandeel and AKCJ." They further argue that these financial records were inadmissible hearsay, not subject to the business records exception in Evidence Code section 1271.

The failure to object in the trial court to inadmissible hearsay evidence forfeits the issue on appeal. (Evid. Code, § 353, subd. (a) ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Eubanks* (2011) 53 Cal.4th 110, 142; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 725 [the failure to object to the admission of hearsay documents in the trial court forfeits the issue on appeal]; *In re Marriage of Kerry* (1984) 158 Cal.App.3d 456, 466 [the failure to object to the admission of an affidavit as hearsay "waives the defect[], and the affidavit becomes competent evidence"]; *People v. Dorsey* (1974) 43 Cal.App.3d 953, 960

---

[11]    Exhibit 2632, METI's December 31, 2007, balance sheet reflecting an investment in TEC of $8,603,438, also was admitted without objection.

21

["before an appellate court will give consideration to an objection to evidence, the *specific ground* for its exclusion must have been clearly stated to the trial court"].)  Although defendants objected to some of Orr's testimony on hearsay grounds and objected to Exhibits 1076 and 10 on foundation grounds, they did not object to the admission of Exhibits 10, 1076, or 2631 on hearsay grounds.  Accordingly, they have forfeited review of this issue.

E.     *Standing*

The al-Jarallahs invested funds in Pi Capital which then invested $9 million in SIIC, $42 million in PIHG, and $15 million in METI.  The conversion verdicts were based on SIIC's $6 million in transfers to Kandeel, PIHG's $5.7 million loan to AKCJ, and METI's $8.6 million transfer to TEC.  Defendants contend that SIIC, PIHG, and METI (or, secondarily, Pi Capital) were harmed by the conversions and not the al-Jarallahs or their assignee Greenfield.  Thus, Greenfield lacked standing to pursue the conversion claims.  We disagree.

Every action must be prosecuted in the name of the real party in interest unless a statute provides otherwise.  (Civ. Code, § 367.)  "'A real party in interest is one who has "an actual and substantial interest in the subject matter of the action and who would be benefited or injured by the judgment in the action." [Citation.]'  [Citation.]" (*Chao Fu, Inc. v. Chen* (2012) 206 Cal.App.4th 48, 57.)  "Lack of standing may be raised at any time in the proceeding, including at trial or in an appeal." (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1000.)

22

Defendants contend that instead of an action to enforce the al-Jarallahs' rights, a shareholder's derivative suit should have been filed on behalf of SIIC, PIHG, METI, or Pi Capital for any loss those entities suffered. "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act. Thus, 'the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' [Citations.] '. . . The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual.' [Citation.]" (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106–107 (*Jones*).) When a shareholder's action does not seek to recover on behalf of the corporation for an injury to the corporation, but instead seeks to recover for an injury that is personal to the shareholder and not incidental to an injury to the corporation, the shareholder has standing to enforce her rights. (*Ibid.*)

The gravamen of Greenfield's action against defendants was that the al-Jarallahs were convinced to fund Pi Capital which would invest their money as part of a scam to defraud them and convert their funds. The Greenfield action did not seek to recover for an injury to SIIC, PIHG, METI, or Pi Capital, but instead to recover for an injury to the al-Jarallahs. Accordingly, Greenfield, through its assignment from the al-Jarallahs, had

23

standing to bring the conversion action against defendants. (*Jones, supra*, 1 Cal.3d at pp. 106–107.)

F.     *Attorney Fees*

Pi Capital contends the trial court erred in denying it attorney fees.  Greenfield argues we do not have jurisdiction over this contention because Pi Capital did not appeal from the court's order denying its attorney fees request.  We hold that we lack jurisdiction to consider Pi Capital's contention.

"[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction." (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 670 (*Hollister*).)  Absent a timely notice of appeal, an appellate court "lacks all power to consider the appeal on its merits and must dismiss" it.  (*Id.* at p. 674; *Marshall v. Webster* (2020) 54 Cal.App.5th 275, 284 & fn. 10 (*Marshall*).) "[A]lthough failure to file a notice of appeal is a jurisdictional defect that cannot be remedied, once a notice is filed it is to be construed liberally in favor of its sufficiency." (*Beltram v. Appellate Department* (1977) 66 Cal.App.3d 711, 714 (*Beltram*).)

The notices of appeal defendants filed in this case were: (1) Kandeel and AKCJ's April 24, 2019, notice of appeal of an order after judgment, and (2) Kandeel and AKCJ's April 24, 2019, notice of cross appeal of the judgment and an order after judgment.  Pi Capital did not file a notice of appeal.

Pi Capital argues we should construe Kandeel and AKCJ's notice of appeal from the judgment to include the order denying Pi Capital's attorney fees request because the judgment included a blank to fill in any attorney fees award.  In support of its

24

argument, it relies on *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993 (*Grant*). Pi Capital's reliance is unavailing.

In *Grant, supra*, 2 Cal.App.4th 993, a judgment was entered in the defendants' favor on August 26, 1988. (*Id.* at p. 996.) The defendants were awarded their costs. (*Ibid.*) As part of the cost award, certain defendants were awarded their attorney fees. (*Ibid.* & fn. 6.) The trial court left the judgment blank as to the amounts of the various awards, "presumably for later insertion by the clerk." (*Id.* at p. 996.)

On September 6, 1988, the plaintiffs filed their notice of appeal challenging the judgment. (*Grant, supra*, 2 Cal.App.4th at p. 996.) Later, the defendants filed their respective cost memoranda, including their requests for fees. (*Ibid.*) The plaintiffs moved to tax costs. (*Ibid.*) On December 29, 1988, the trial court issued an order setting the amount of attorney fees awarded. (*Ibid.*) On March 13, 1989, notice of entry of that order was filed. (*Ibid.*) The plaintiffs did not file a separate appeal from the order setting the amount of attorney fees. (*Ibid.*)

On appeal, the court noted that when a "judgment includes an award of costs and fees, often the amount of the award is left blank for future determination. [Citation.] After the parties file their memoranda of costs and any motions to tax, a postjudgment hearing is held and the trial court makes its determination of the merits of the competing contentions. When the order setting the final amount is filed, the clerk enters the amounts on the judgment nunc pro tunc. [Citation.]" (*Grant, supra*, 2 Cal.App.4th at pp. 996–997.)

Noting, among other rules, the general rule that a notice of appeal should be construed in favor of sufficiency, the court held that when a judgment awards attorney fees to a prevailing party

25

and provides for the later determination of the amount of those fees, a notice of appeal only from the judgment subsumes any later order setting the amount of the attorney fees awarded. (*Grant, supra*, 2 Cal.App.4th at pp. 997–998.)  Pi Capital argues we, like the court in *Grant*, "should construe the cross-appeal from the 2019 judgment—which also left a blank amount for an award of fees to prevailing party Pi Capital—to subsume the later fee order denying Pi Capital those fees."

This case is unlike *Grant, supra*, 2 Cal.App.4th 993.  In *Grant*, the parties challenging an attorney fees award filed a notice of appeal from a judgment that included the award of attorney fees, but did not separately appeal from the subsequent order setting the amount of those fees.  Here, Pi Capital did not file a notice of appeal from the judgment or from the subsequent order denying it attorney fees.

Because Pi Capital did not appeal from either the judgment or the order denying its attorney fees request, we do not have jurisdiction over its contention that the trial court erred in denying its attorney fees request.  (*Beltram, supra*, 66 Cal.App.3d at p. 714 ["failure to file a notice of appeal is a jurisdictional defect that cannot be remedied"]; *Hollister, supra*, 15 Cal.3d at pp. 670, 674; *Marshall, supra*, 54 Cal.App.5th at p. 284 & fn. 10.)  Accordingly, Pi Capital's appeal of the denial of its attorney fees request is dismissed.  (*Hollister, supra*, 15 Cal.3d at p. 674.)

## IV.   DISPOSITION

Pi Capital's appeal from the denial of its attorney fees request is dismissed.  The judgment is vacated and remanded.  The trial court is directed to enter a new judgment consistent with this opinion that includes an award to Greenfield of prejudgment interest on its $25 million fraud and negligent misrepresentation verdict.  Greenfield is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:



BAKER, Acting P. J.



MOOR, J.

27