Filed 8/28/24  Siddiqui v. Molayem CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RUBY SIDDIQUI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> GEORGE MOLAYEM et al., <br><br> Defendants and Appellants. | B317507, B319705 <br><br> (Los Angeles County Super. Ct. No. SC127504) |

APPEALS from a judgment and postjudgment order of the Superior Court of Los Angeles County, Mark A. Young, Judge. Affirmed in part, reversed in part, and remanded with directions.

Law Offices of Stanley H. Kimmel and Stanley H. Kimmel for Defendants and Appellants.

Child & Marton and Bradford T. Child for Plaintiff and Appellant.

_____

Defendants Hill Street Jewelers USA, Inc. (Hill Street) and George Molayem (collectively, defendants) committed fraud against plaintiff Ruby Siddiqui when they induced her to pay $171,663.15 for jewelry she successfully bid on through their online jewelry auctions, by misrepresenting that the auctions were affiliated with the United States government and misrepresenting the sources, quality, and workmanship of the 63 items of jewelry she purchased. Defendants do not challenge the trial court's determination, made after a court trial, that Siddiqui had been defrauded, but they do challenge the amount of restitution damages and prejudgment interest awarded, as well as the award of punitive damages.

After the bench trial, the trial court awarded Siddiqui $171,663.15 as restitution for rescission of the auction contracts based on fraud; prejudgment interest on that amount at an annual rate of 10 percent from the date Siddiqui paid defendants for the jewelry; and $343,326.30 in punitive damages (two times the restitution amount). We affirm the trial court's award of restitution and punitive damages. However, we agree with defendants that the court erred in awarding prejudgment interest at the 10 percent rate applicable to breach of contract claims. We reverse that portion of the judgment and remand the matter for recalculation of prejudgment interest.

Siddiqui appeals from the trial court's postjudgment order denying her motion for attorney fees under Civil Code[1] section 1717 based on an attorney fees provision in the auction contracts. The trial court concluded Siddiqui is not entitled to attorney fees because (1) the contractual fee provision states that it applies

---

[1] Undesignated statutory references are to the Civil Code.

2

only to collection actions and (2) this action is not "on a contract" within the meaning of section 1717.  We disagree with these legal conclusions.  Under section 1717, the attorney fees provision must be applied to all claims on the auction contracts in order to effectuate the complete mutuality of remedy intended by the legislature.  This action for rescission of the auction contracts based on fraud is "on a contract," in that an interpretation of the terms and conditions of the contracts was integral to the trial court's resolution of Siddiqui's claims and defendants' defenses thereto.  We reverse the order denying Siddiqui's motion for attorney fees and remand the matter for a determination of the amount of attorney fees to award her.

FACTUAL AND PROCEDURAL BACKGROUND[2]

**A.  Siddiqui Decides to Use Her Disability Insurance Payment to Start a Jewelry Business**

In 2012, Siddiqui became disabled from her profession as a medical doctor.  In 2015, she received a lump sum payment from her disability insurance.  She had previously learned to make jewelry during an earlier illness and she decided to start a business with the funds from her disability insurance.  She devised a plan to purchase some pieces of jewelry from federal government auctions, refurbish them, and sell them for a higher

---

[2] Unless otherwise specified, the summary of events is taken from Siddiqui's trial testimony.  As discussed, *post*, the trial court found her testimony to be credible and found Molayem's testimony on important issues to be not credible.

price.  She trusted government auctions more than other auction houses because she did not believe she "would get cheated" there.

**B.      Siddiqui Finds "Federal Government Auction" and "U.S. Jewelry Liquidation," and She Purchases 63 Pieces of Jewelry Through Them for $171,663.15**

Siddiqui searched online for auction houses.  She discovered a website called Invaluable that connected her with many different sellers.  Through Invaluable, she found "Federal Government Auction" and "U.S. Jewelry Liquidation."  Based on their marketing, she believed these auction sites were affiliated with the United States government.  Federal Government Auction represented on its website that its luxury inventory came from tax delinquency cases, and it listed a case number in connection with each piece of jewelry.  Siddiqui did not see anything on the websites indicating Federal Government Auction and U.S. Jewelry Liquidation were not affiliated with the United States government.

The auction catalogs Siddiqui reviewed before she placed her bids, included photos and descriptions of each item of jewelry.  She relied on these photos and descriptions in deciding to bid on certain items.  Some of the pieces also had gemological reports associated with them that were purportedly signed by a graduate gemologist.  She took note of these reports before she made her bids, believing they looked official.  She explained, "It was very important to [her] that there was an actual gemological laboratory that had looked at the jewels and certified them."

The auction catalogs for Federal Government Auction included terms and conditions, which Siddiqui skimmed before she placed her bids.  She understood that all sales were final, and she knew she would owe a buyer's premium of 19 percent as well

4

as a restocking fee of 25 percent if she canceled her purchase. She did not see a term indicating Federal Government Auction was not affiliated with any federal government agency.

On April 15, 2016, Siddiqui successfully bid on 55 items of jewelry from Federal Government Auction.  The following day, she was the high bidder on six items from U.S. Jewelry Liquidation.  On April 17, 2016, she successfully bid on an additional item from Federal Government Auction and another from U.S. Jewelry Liquidation.  She received invoices for her purchases totaling $171,663.15.  The invoices included black-and-white photos of the jewelry she purchased and descriptions of the jewelry.

On April 18, 2016, Siddiqui received a text message and an email from defendant Molayem, who indicated he worked for a company called "Multi Auction Services," an entity that serviced Federal Government Auction and U.S. Jewelry Liquidation. Molayem requested that she wire a total of $171,663.15, in two separate wire transfers, to a bank account in his name.  The same day, Siddiqui went to her bank and made the transfers as instructed.

C.    **Siddiqui Discovers Federal Government Auction and U.S. Jewelry Liquidation Are Not Affiliated With the United States Government, and She Attempts to Cancel Her Purchases**

Within 30 minutes after she made the wire transfers, Siddiqui called Molayem to let him know her bank had sent them.  She asked him why the wires were going to a personal account instead of a federal government account.  She inquired

5

about his connection with the federal government. He indicated he had none, explaining, " 'It's just marketing.' "

Siddiqui conducted online research regarding Molayem and discovered his affiliation with defendant Hill Street. She learned that Hill Street conducted business under many different names. After subsequent telephone conversations and text messages with Molayem, she believed "this was a really clever scam," and she did not want to be a part of it. She attempted to cancel the wire transfers, but the bank told her it was too late.

During their telephone calls, Siddiqui told Molayem she wanted to cancel her auction purchases and asked him not to send the jewelry. Molayem said there would be a "restocking fee" and other charges totaling around $70,000, even though she had not received any of the jewelry yet.

On April 25, 2016, Siddiqui sent an email to Molayem, attempting to cancel her purchases and get a full refund of the money she paid. She was unsuccessful. On April 27, 2016, Molayem advised Siddiqui that her request to cancel the transactions was denied and represented that most of the auction lots were under inspection getting ready to ship.

On May 2, 2016, Siddiqui sent Molayem another email to the same effect as her previous email. By this point she had received invoices for her purchases from Invaluable, which included color photos of the items she purchased (instead of the black-and-white photos she received in the invoices from defendants), and she realized the photos of the items and the descriptions of the items in the invoices did not match (e.g., color of the stones).

After defendants refused her requests to cancel the purchases, Siddiqui demanded they ship the jewelry to her

6

immediately. She made the demand because she suspected defendants did not yet have the jewelry in their possession, and she wanted to confirm her suspicion. On May 18, 2016, Siddiqui refused to accept a delivery that came from defendants' address. At some point, thereafter, Siddiqui told Molayem she would forfeit the $70,000 in fees and charges if defendants would refund the rest of her money. They declined to refund any of her money.

## D. Siddiqui Files This Action and Shortly Thereafter Defendants Send Her Some of the Auction Items Under the Guise of Amazon Shipments

In May 2017, more than a year after Siddiqui made her purchases from defendants, she filed this action seeking return of her money and other damages. Around a month later, in June 2017, Siddiqui received two packages in Amazon boxes, that she believed were products she had purchased from Amazon. She opened the boxes and found little baggies inside containing jewelry. She had not asked defendants to send her the jewelry at that time. She noticed that the jewelry she received did not match the photos and descriptions of the items on which she bid during the auctions. Moreover, the boxes contained four fewer pieces than what she had ordered. She taped the boxes back up and placed them on a shelf in her closet and did not reopen them.

In the operative first amended complaint in this action, Siddiqui asserted causes of action for fraud, statutory fraud under Business and Professions Code section 17533.6,[3]

---

[3] Under Business and Professions Code section 17533.6, subdivision (a), except in circumstances not relevant here, "it is unlawful for any person, firm, corporation, or association that is a nongovernmental entity to use a seal, emblem, insignia, trade or

7

conversion, and violation of Penal Code section 496 (receipt of property obtained by theft). On the fraud cause of action—which alleges defendants defrauded her by making misrepresentations in the auction contracts and concealing true facts to induce her to pay them $171,663.15—Siddiqui sought rescission of the auction contracts[4] and restitution of the $171,663.15 she paid defendants.

On April 29, 2019, defendants moved for summary judgment/summary adjudication contending that terms and conditions of the auction contracts demonstrated defendants were entitled to judgment as a matter of law. For example, they asserted they did not misrepresent that they were affiliated with the United States government, citing a disclosure in the contracts stating that Federal Government Auction is not directly affiliated with any federal government agency. They also argued the contracts obligated Siddiqui to pay for and accept the auction

_____

brand name, or any other term, symbol, or content that reasonably could be interpreted or construed as implying any federal, state, or local government, military veteran entity, or military or veteran service organization connection, approval, or endorsement of any product or service, including, but not limited to, any financial product, goods, or services, by any means, including, but not limited to, a mailing, electronic message, Internet Web site, periodical, or television commercial disseminated in this state, unless the nongovernmental entity has an expressed connection with, or the approval or endorsement of, a federal, state, or local government, military veteran entity, or military or veteran service organization."

[4] What the parties and the trial court refer to as the "auction contracts" are the auction catalogs, which contain photos and descriptions of the jewelry and the terms and conditions of the auctions, among other things.

8

items, citing specific terms of the contracts, including a provision stating all sales were final. Moreover, defendants invoked provisions in the contracts requiring a buyer to pay a 19 percent buyer's premium and a 25 percent restocking fee for any returns (which, in this case, would have required Siddiqui to forfeit around $75,000 or 44 percent of $171,663.15 she paid defendants) and contended that her refusal to honor these contractual terms precluded her from cancelling the contracts.[5] The trial court denied the motion, and defendants have not appealed from that ruling.[6]

## E. The Trial

### 1. *Pertinent witness testimony*

In addition to Siddiqui's testimony, which we have already summarized, her expert gemologist and appraiser (Diana Cinamon) testified that she examined 58 pieces of jewelry Siddiqui received from defendants and reviewed the corresponding auction listings. She found 244 misrepresentations in the auction listings regarding the quality

_____

[5] As noted above, Siddiqui testified that the fees and charges defendants sought to impose for cancellation of the contracts equaled around $70,000. In fact, the true calculation amounts to around $75,000.

[6] Although the matter is not directly before us, we take note of the substance of defendants' motion because it is relevant to Siddiqui's contention on her appeal that her action is "on the contract" for purposes of an entitlement to an award of attorney fees under section 1717. (See, *post*, Discussion section B.2.) Defendants invoked the auction contracts and asked the trial court to interpret and enforce numerous terms in their favor in their attempt to defeat Siddiqui's fraud causes of action.

9

of the gemstones, the weight of the gold, and the workmanship of the jewelry. She testified that 21 of the 58 pieces had gemological reports attached as part of the auction listings (i.e., the auction contracts). She concluded, based on her research, that both the laboratory listed as the source of the gemological reports, and the graduate gemologist who purportedly authored the reports, did not exist.

Molayem testified that he is the sole owner of Hill Street. He stated that Hill Street operated online jewelry auctions under the names Federal Government Auction and U.S. Jewelry Liquidation. Defendants and their fictitious businesses had no affiliation with the government. Molayem selected the name "Federal Government Auction" as "a marketing effort," but not to make buyers believe it was the United States government that was auctioning off the jewelry. Molayem testified that the auctions were supposed to include real property, and that is why one of Hill Street's employees included tax delinquency case numbers in the titles of the auctions; but the employee did so prematurely, before they had the real property to put in the auctions, and without Molayem's knowledge. Molayem also testified about certain terms and conditions in the Federal Government Auction contracts, including fees and charges for returns; a provision stating Federal Government Auction is not responsible for the opinions and appraisals of third parties; a provision indicating there is no affiliation between Federal

Government Auction and the federal government; and an attorney fees provision.

One of Hill Street's employees testified about Hill Street's practice of manufacturing jewelry after a buyer purchases the jewelry at the auction.

2.    *Statement of Decision*

On September 16, 2021, after defendants had an opportunity to submit objections to the proposed statement of decision, the trial court issued its final statement of decision.

The trial court ruled in Siddiqui's favor on her fraud cause of action, finding clear and convincing evidence defendants "intentionally misrepresented affiliation with the United States Government to deceive purchasers like [Siddiqui]." The court further found defendants' 244 misrepresentations in the auction contracts ("the images, descriptions and gemological reports in their auction listings"), which Cinamon had identified, were also intended to induce reliance by purchasers like Siddiqui. The court concluded Siddiqui's reliance on these misrepresentations was reasonable, and expressly found Molayem's testimony not to be credible on significant issues: "The Court does not find credible Mr. Molayem's testimony that [Hill Street employee] 'Reggie' carried out the concept of auctions under federal government names and fake 'tax' cases without Mr. Molayem's consent and approval." Based on the clear and convincing evidence of fraud, the court found Siddiqui is entitled to an award of punitive damages against defendants.

The trial court also ruled in Siddiqui's favor on her statutory fraud cause of action, based on defendants' use of the names Federal Government Auction and U.S. Jewelry Liquidation. The court calculated the statutory damages under

11

Business and Professions Code section 17533.6 as $400,770 (three times the amount solicited, which does not include the sales tax and "cost of sale" Siddiqui paid).

The trial court ruled against Siddiqui on her causes of action for conversion (concluding there was no personal property of Siddiqui's that was converted) and violation of Penal Code section 496 (concluding the statute "is limited in application to persons receiving stolen property").

The trial court found Siddiqui "effected a valid rescission of the auction contracts and her payments of the auction invoices and is entitled to return of her $171,663.15 from [d]efendants. [She] must return the received jewelry to [d]efendants within 60 days of [d]efendants paying this judgment in full." The court awarded Siddiqui $343,326.30 in punitive damages (two times the restitution amount). The court concluded the statutory damages of $400,770 "are duplicative of the rescission and punitive damages to which [Siddiqui] is entitled under the fraud and rescission claims in the [first amended complaint]." The trial court awarded Siddiqui prejudgment interest on the restitution amount from April 18, 2016 (the date she wired defendants the money), at a rate of 10 percent or $47 per day.

3. *Judgment and Siddiqui's motion for attorney fees*

On September 29, 2021, the trial court entered a judgment consistent with the Statement of Decision. On October 26, 2021, the court entered an Amended Judgment, reflecting that defendants are entitled to a $10,000 offset against the total

amount of the judgment based on Siddiqui's settlement with Invaluable LLC, the auction platform defendants had used.

Defendants moved for new trial, which was denied. They challenged all amounts awarded under the judgment.

Siddiqui moved for attorney fees under section 1717, based on a provision in the auction contracts with Federal Government Auction providing, "Bidder shall be responsible for all costs of collection, including court costs and reasonable attorney's fees." The trial court denied the motion, concluding Siddiqui is not entitled to attorney fees because (1) the provision applies only to collection actions, and (2) this action is not "on a contract" within the meaning of section 1717.

Defendants appealed from the judgment, and Siddiqui appealed from the order denying her motion for attorney fees. Both sides acknowledge that defendants have paid the judgment in full.

## DISCUSSION

### A. Defendants' Appeal

1. *The trial court did not err in awarding Siddiqui restitution of amounts paid for rescission of the auction contracts*

Defendants argue the trial court erred in awarding tort damages without complying with section 3343, subdivision (a), which provides, in pertinent part, "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the

13

particular transaction . . . ."[7]  They contend the matter must be remanded for a new trial on compensatory damages because the trial court awarded Siddiqui the amount she paid for the jewelry, but did not make a finding as to the value of the jewelry she received, and subtract the latter amount from the former.

Defendants' argument is inapposite.  Siddiqui did not seek, and the trial court did not award tort compensatory damages.  Rather, the court found Siddiqui elected the remedy of rescission of the auction contracts under section 1691 based on fraud; and the court awarded her restitution of the money she paid defendants for the jewelry and ordered her to return the jewelry to defendants.  (See § 1692 [on "a claim for relief based upon rescission," the "aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him [or her] as a result of the transaction and any consequential damages to which he is entitled; but such relief shall not include duplicate or inconsistent items of recovery"].)

In her respondents' brief, Siddiqui points out this flaw in defendants' argument.  In their reply brief, for the first time in this appeal, defendants raise arguments challenging the propriety of rescission as the appropriate remedy for defendants' fraud (rather than challenging only the monetary amount awarded for rescission, as they did in the trial court and in their opening appellate brief).  " 'When an appellant fails to raise an issue in the opening brief, raising it for the first time in a reply brief or at oral argument, we generally decline to address the issue or address it in a summary manner.' [Citation.]  'Obvious

_____

[7] Defendants raised this issue below in their objections to the statement of decision and in their motion for new trial.

14

reasons of fairness militate against consideration of an issue raised' so late.  [Citation.]  Bearing those considerations in mind, we decline to address [the untimely arguments]." (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, ___ [322 Cal.Rptr.3d 825, 843].)  Defendants offer no reason for choosing not to raise these arguments in their opening brief.  (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before" ' "]; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [same].)  We also note that defendants did not raise these arguments in the trial court.

Defendants have demonstrated no error in the trial court's award of restitution for rescission of the auction contracts.

2.    *Prejudgment interest was properly awarded but must be recalculated at the applicable rate*

Defendants argue Siddiqui is not entitled to an award of prejudgment interest under section 3287 or 3288, and even if she were, the trial court applied the wrong interest rate.  We reject the first argument and agree with the second.

Under section 3287, subdivision (a), a "person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest from that day," except under enumerated circumstances not relevant here.  Section 3288 provides, "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."  "[W]hen sections 3287 and 3288 are read

15

together, the proper rule is that [a] defrauded party may ask for damages from the date of the fraud, but whether interest is to be awarded is left to the discretion of the trier of fact which is to be exercised in consideration of the circumstances of the individual case." (*Pepitone v. Russo* (1976) 64 Cal.App.3d 685, 690; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1586-1587 (*Michelson*) ["the trier of fact, whether jury or the court, appropriately decides the issue of prejudgment interest under" section 3288].)  Here, the trial court awarded Siddiqui prejudgment interest from April 18, 2016, the date she wired defendants the money for the jewelry (the same date she questioned defendants about their affiliation with the United States government).

Defendants argue section 3287, subdivision (a) is inapplicable because Siddiqui's claim for damages was unliquidated (i.e., not "certain, or capable of being made certain by calculation") and required the trial court to make factual findings based on evidence.  This is an extension of their argument that the court violated section 3343 by awarding Siddiqui damages without making a finding as to the value of the jewelry she received and subtracting that amount from what she paid—an argument we rejected above.  Siddiqui's claim for $171,663.15 in restitution for rescission of the auction contracts was an amount certain on April 18, 2016.  Under sections 3287 and 3288, an award of prejudgment interest from that date is proper.

Defendants' second argument regarding prejudgment interest is that the trial court erroneously applied a 10 percent interest rate rather than a 7 percent rate applicable to fraud claims.  Siddiqui acknowledges the court applied the 10 percent

16

rate, and she also acknowledges a 7 percent rate applies to prejudgment interest awarded on fraud claims under section 3288. (See *Michelson*, *supra*, 29 Cal.App.4th at p. 1587 ["There is no legislative act specifying the rate of prejudgment interest for a fraud claim, and therefore the constitutional rate of 7 percent [under Article XV, section 1 of our state Constitution] applies to the [amount] awarded as tort damages"].)

However, Siddiqui asserts defendants forfeited their challenge to the 10 percent interest rate by not raising it below, "either at the time of the award or in their new trial motion." Defendants ask us to exercise our discretion and decide the issue on the merits. "Whether the proper interest rate was applied is a question of law." (*Michelson*, *supra*, 29 Cal.App.4th at p. 1585.) "As a general rule, a new theory may be presented for the first time on appeal if it raises a question of law that can be decided on undisputed facts." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 948, fn. 14.) This is such a question, and we exercise our discretion to decide it on the merits despite defendants' failure to raise it below.

Responding to the merits of defendants' contention that the interest rate awarded is excessive, Siddiqui argues the 10 percent rate the trial court applied is proper under section 3289, which provides, in pertinent part:

"(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before until the contract is superseded by a verdict or other new obligation.

"(b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

17

Here, Siddiqui's recovery against defendants is not based on a finding of *breach* of the auction contracts. Rather, the trial court awarded her restitution after deeming the contracts rescinded based on fraud. Absent a finding of breach of contract, section 3289 is inapplicable. We agree with defendants that 7 percent is the applicable interest rate for prejudgment interest on the amount Siddiqui recovered on her fraud cause of action.

We reverse the award of prejudgment interest and remand the matter to the trial court to calculate prejudgment interest from April 18, 2016 to October 26, 2021 (the date of the Amended Judgment), at a rate of 7 percent, and to exercise its discretion in deciding whether to award simple or compound interest. (See *Michelson*, *supra*, 29 Cal.App.4th at pp. 1587-1588 [trier of fact has discretion to award compound prejudgment interest under section 3288].)[8]

3. *Defendants have not shown error as to the punitive damages award*

The trial court awarded Siddiqui $343,326.30 in punitive damages. A party who recovers restitution for rescission of a contract based on fraud may also recover punitive damages for that fraud. (*Horn v. Guaranty Chevrolet Motors* (1969) 270 Cal.App.2d 477, 484 (*Horn*); § 1692 [a party who seeks relief based upon rescission of a contract may recover restitution and "any other relief to which he may be entitled under the circumstances"]; 1 Witkin, Summary of Cal. Law (11th ed. 2024) Contracts, § 902 ["In a number of situations involving contractual

---

[8] Siddiqui acknowledges an award of compound prejudgment interest at a rate of 7 percent would be less than the amount of prejudgment interest the trial court awarded.

18

obligations, the injured party has the election of alternative contract or tort actions, and punitive damages may be recovered in causes of action in contract and tort"].) Defendants do not dispute this general principle. Nor do they challenge the court's finding of clear and convincing evidence of fraud, entitling Siddiqui to an award of punitive damages under section 3294. Defendants challenge the punitive damages award on grounds (1) that the amount is excessive given the lack of reprehensibility of defendants' conduct and (2) there is insufficient evidence of defendants' assets, liabilities, net worth, and ability to pay to support the award of punitive damages.

a.     *Defendants have not demonstrated the punitive damages award is excessive*

Defendants contend the punitive damages award is excessive under federal due process standards, citing *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442 (*Colucci*). The appellate court in *Colucci* explained that, in reviewing a punitive damages award for compliance with the due process clause of the United States Constitution, "a court must 'consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [trier of fact] and the civil penalties authorized or imposed in comparable cases.' " (*Id.* at p. 457, quoting *State Farm Mutual Automobile Inc. Co. v. Campbell* (2003) 538 U.S. 408, 418 (*State Farm*).)

"In deciding whether an award of punitive damages is constitutionally excessive under [United States Supreme Court precedents], we are to review the award de novo, making an

19

independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 & fn. 2.) "On the other hand, findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Id.* at p. 1172.)

The degree of reprehensibility of the defendant's conduct— the "guidepost" on which defendants focus in this appeal—is the " ' "most important indicium of the reasonableness of a punitive damages award." ' " (*Colucci, supra*, 48 Cal.App.5th at p. 457, quoting *State Farm, supra*, 538 U.S. at p. 419.) Courts " 'determine the reprehensibility of a defendant by considering whether: [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Colucci*, at p. 457.)

The first three factors for measuring reprehensibility are inapplicable, as Siddiqui suffered only economic harm, there is no evidence defendants' conduct impacted health or safety of others, and Siddiqui was not known to defendants to be financially vulnerable.

As to the remaining two factors, they weigh strongly in favor of finding defendants' conduct to have been reprehensible. They engaged in a fraudulent online scheme to trick and deceive buyers into believing they were purchasing high-quality antique

20

and heirloom jewelry, that had been seized in tax cases, from auction sites affiliated with the federal government.[9]  In reality, defendants had no affiliation with the federal government; the tax cases they identified on their auction sites were fake; and they provided items to Siddiqui that did not match the quality described and shown in the auction catalogs.  In fact, the jewelry shipped to Siddiqui had not been seized in tax cases, but was fabricated by defendants after the auctions.  Moreover, when Siddiqui sought to cancel her purchases because she had been misled into believing defendants were affiliated with the federal government, defendants sought to impose punitive penalty provisions in the terms and conditions of their auction materials that would require her to forfeit 44 percent of her payments. Defendants received $171,663.15 from Siddiqui through their fraudulent scheme.  The award of $343,326.15 in punitive damages was not excessive when considered in light of the reprehensibility of defendants' conduct.

With respect to the second "guidepost," defendants suggest, relying on *Colucci,* that a ratio of 1.5-to-one between punitive and compensatory damages is the maximum ratio permitted by due process.  The Court of Appeal did not make such a broad pronouncement in *Colucci*.  The court concluded a 1.5-to-one ratio

_____

[9] Defendants maintain they "did not seek to mislead the public," noting that fictitious business name statements "identified Hill Street as the operator of the auctions," and "the terms of sale of the auction stated Federal Government Auction was not an entity of the US Government."  The trial court rejected this contention and found that the government affiliation representations, along with the other representations relied upon by Siddiqui, were fraudulent.

21

was "the federal constitutional maximum" in *that* case, "[g]iven the low to moderate range of reprehensibility of [the defendant]'s conduct" and the "substantial" award of compensatory damages ($1,020,042), the "majority of which was for noneconomic harm and/or emotional distress ($700,000)," indicating a " 'punitive component' " to the compensatory damages award. (*Colucci, supra*, 48 Cal.App.5th at p. 459 [action against former employer for workplace retaliation based on disability].) Here, the trial court awarded Siddiqui restitution of amounts she paid defendants, with no consequential damages. There was no punitive component in the restitution award, which simply returned Siddiqui to her position before the transaction she succeeded in rescinding. Given these factors, the two-to-one ratio between punitive damages and restitution does not violate due process. (See *Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (2021) 62 Cal.App.5th 88, 108, 110 [ratio of two-to-one between punitive and compensatory damages did not violate due process where the defendant employer's conduct (workplace disability discrimination) was "moderately reprehensible" and there was a "sizable compensatory damages award"].)

As for the third "guidepost" in evaluating an award of punitive damages under due process standards, defendants' arguments fail to address a comparison of the punitive damages awarded against them to " 'the civil penalties authorized or imposed in comparable cases.' " (*Colucci, supra*, 48 Cal.App.5th at p. 457, quoting *State Farm, supra*, 538 U.S. at p. 418.) Here, the trial court found defendants liable for $400,770 in damages for statutory fraud (three times the amount defendants solicited from Siddiqui) under Business and Professions Code section

22

17533.6, subdivision (e).[10]  But the court found the statutory damages to be "duplicative" of the restitution and punitive damages, so the court did not order defendants to pay them. Section 17533.6, subdivision (e), however, provides that statutory damages may be awarded "in addition to any other available remedies."  The trial court could have awarded Siddiqui $171,663.15 in restitution *and* $400,770 in statutory damages for a total of $572,433.15.  The amount it did award, $514,989.45 (restitution plus punitive damages), fits comfortably within the zone of reasonableness when evaluated under this guidepost.[11]

---

[10] The trial court found that the "amount solicited" did not include the sales tax ($12,691.35) and the "cost of sale" ($25,382.10), which were included in the restitution award.

[11] We note that Siddiqui also sought treble damages and attorney fees under Penal Code section 496 for defendants' receipt of property (money) obtained by theft.  The trial court ruled against her, concluding the statute "is limited in application to persons receiving stolen property."  Subsequent to entry of judgment in this case, the California Supreme Court reversed the case on which the trial court relied and held a "plaintiff may recover treble damages and attorney's fees under section 496(c) when property has been obtained in any manner constituting theft," including theft by false pretense.  (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 361; see Pen. Code, § 532, subd. (a) ["person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property" is guilty of theft by false pretenses].)  Siddiqui did not appeal the trial court's ruling on her Penal Code section 496 claim, but the potential availability of another statutory basis for awarding treble damages for conduct such as was proven in this case

23

b. *Sufficiency of the evidence of defendants'*
*financial condition and ability to pay the*
*punitive damages award*

In their opening appellate brief, defendants argued there is insufficient evidence of defendants' assets, liabilities, net worth, and ability to pay to support the award of punitive damages.

"The purposes of punitive damages are to punish the defendant for the conduct that harmed the plaintiff and deter the commission of future wrongful acts." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 191 (*Soto*).) The " 'proper level of punitive damages is an amount not so low that defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the defendant.' " (*Id.* at p. 192.)

"In order for the [trier of fact] (and the reviewing court) to ascertain whether a punitive damages award is properly calibrated so as to inflict economic pain without financially ruining the defendant, it needs some evidence about the defendant's financial condition and ability to pay the award." (*Soto, supra*, 239 Cal.App.4th at p. 192; *Adams v. Murakami* (1991) 54 Cal.3d 105, 109 (*Adams*) ["an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition"].) The plaintiff bears the burden of introducing such evidence. (*Adams*, at p. 109.)

Under section 3295, subdivision (c), a "plaintiff may subpoena documents or witnesses to be available at the trial for

_____

further validates the reasonableness of the trial court's decision to award punitive damages equal to twice the rescission award.

the purpose of establishing" the defendant's financial condition. The defendant's failure to comply with such a subpoena may preclude the defendant "from challenging the punitive damage award[] based on lack of evidence of his financial condition or insufficiency of the evidence to establish his ability to pay the amount awarded." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1338; *Soto*, *supra*, 239 Cal.App.4th at p. 194 ["the Court of Appeal has upheld awards of punitive damages where the dearth of evidence of the defendant's financial condition is attributable to the defendant's failure to comply with discovery obligations or orders"].)

In her respondent's brief, Siddiqui argues "defendants have forfeited a challenge to the punitive damages award based on insufficient evidence of net worth" by failing to produce documents in response to the trial subpoena she served on them seeking financial records. The parties discussed the subpoena in court during trial. Defense counsel questioned the timeliness of the subpoena, which was served in the midst of trial. Siddiqui's counsel argued the subpoena was timely and explained he wanted to make sure Siddiqui "had some evidence of net worth to present with respect to punitive damages in the case." Defense counsel informed the court that defendants had no documents responsive to the subpoena, and he had told Siddiqui's counsel the same thing earlier. The court inquired: "There's no bank statements? The most recent set of documents reflecting the net worth, income, assets, brokerage accounts, bank statements, retirement accounts, liabilities, real estate, and other financial holdings of George Molayem. [¶] So obviously to the extent he has bank statements, brokerage accounts, you know." Defense counsel indicated he would check with Molayem regarding the

25

existence of such documents and suggested the court "bifurcate this out and deal with it if we get to a point where [Siddiqui] can show intentional outrageous misconduct by Mr. Molayem." The court responded, "We'll deal with it then." There was no further discussion on the record regarding the subpoena, and there was no bifurcated punitive damages phase of the trial.

Defendants did not respond to Siddiqui's forfeiture argument in their appellate reply brief (or reference the subpoena at all in their appellate briefing). They did not dispute that their failure to produce documents prevented Siddiqui from introducing additional evidence based on such documents, regarding their liabilities, net worth, or other aspects of their financial condition. An appellant's failure to respond in the reply brief to an argument made in the respondent's brief may be taken as an implicit concession of the validity of the argument. (*Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89-90 [appellants made implicit concession by "failing to respond in their reply brief to the [respondent]'s argument on th[at] point"]; *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519, fn. 4 ["since [appellant] did not dispute respondent's claim in his reply, we assume that there is no remaining question as to" the claim].) We will not disturb the judgment based on insufficiency of the evidence where defendants do not challenge Siddiqui's claim that their failure to comply with discovery obligations precluded her from presenting additional evidence.

Defendants have shown no cause for us to disturb the punitive damages award.

26

## B.     Siddiqui's Appeal

In her appeal, Siddiqui challenges the trial court's postjudgment order denying her motion for attorney fees under section 1717, which provides, in pertinent part:

"In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

"Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." (§ 1717, subd. (a).)

The auction contracts with Federal Government Auction included the following attorney fees provision, which appears twice in the contracts' terms and conditions:  "Bidder shall be responsible for all costs of collection, including court costs and reasonable attorney's fees."

The trial court denied Siddiqui's motion for attorney fees for the following reasons.  First, the court concluded the attorney fees provision is inapplicable here because this action does not involve a "collection."  Second, the court concluded Siddiqui "did not seek to enforce the contract and did not proceed under a theory of breach of contract.  [She] has not shown that this action is an action on a contract under Civil Code section 1717."  We disagree with both conclusions.

27

"An order granting or denying attorney fees is generally reviewed under an abuse of discretion standard, though determination of whether the criteria for an award have been met is a question of law which is reviewed de novo." (*Gillotti v. Stewart* (2017) 11 Cal.App.5th 875, 905.) In this case, the issue presented is whether the applicable attorney fees provision in the auction contracts should apply under section 1717, which turns on whether Siddiqui's action is "on the contract." Our review is de novo. (See *347 Group, Inc. v. Philip Hawkins Architect, Inc.* (2020) 58 Cal.App.5th 209, 213 [a party's entitlement to attorney fees under section 1717 is a question of law that we review de novo].)

1. *Under the express language of section 1717, the attorney fees provision applies to the entire contract, not just defendants' efforts to collect amounts due*

As quoted above, the second paragraph of section 1717, subdivision (a) expressly provides that where a contract includes an attorney fees provision, "that provision shall be construed as applying to the entire contract" (except in limited circumstances not relevant here). The "legislative intent was to provide complete mutuality of remedy where a contractual provision makes recovery of attorney fees available to one party." (*Harbor View Hills Community Assn. v. Torley* (1992) 5 Cal.App.4th 343, 349.) Where a contract includes a one-sided attorney fees provision that by its terms only applies to actions one side would bring (e.g., collections here), that attorney fees provision will be applied to the entire contract and all actions on the contract. (*Reyes v. Beneficial State Bank* (2022) 76 Cal.App.5th 596, 617 (*Reyes*) [where a contract included a "one-sided" attorney fees provision allowing the defendant to seek an award of attorney

28

fees for collecting what plaintiffs owed under the contract, § "1717, subdivision (a) makes the remedy mutual as to plaintiffs"].) Thus, the attorney fees provision in the auction contracts is not limited to collection actions that defendants might have brought.

2. *Siddiqui's action is "on a contract" for purposes of entitlement to attorney fees under section 1717*

A party may only recover attorney fees under section 1717 where the action is "on a contract." The statute, however, does not require that the action be for breach of contract. " ' " [I]t is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be "on a contract" for purposes of [section] 1717.' " ' [Citation.] 'Nevertheless, we distill . . . the following principle: An action (or cause of action) is "on a contract" for purposes of section 1717 if (1) the action (or cause of action) "involves" an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement, and (2) the agreement contains an attorney fees clause.' " (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 407-408 (*Orozco*).)

Applying these principles here, Siddiqui's action arises out of a contract because the court had to "define and interpret" the representations in the contract as part of its determination of the parties' "rights or duties under the agreement."

a.  *Siddiqui's action seeking rescission based on fraud is an action on a contract within the meaning of section 1717*

A party need not seek to enforce the contract in order to be entitled to an award of attorney fees under section 1717.  A party may be entitled to such fees even where the court finds the contract is " 'invalid, unenforceable or nonexistent.' "  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 (*Hsu*); see *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541 (*Super 7 Motel Associates*); *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 427 ["it is difficult to think of an action that is more likely to be characterized as an 'action on a contract' than one in which the party bringing the action explicitly seeks to have the subject contract declared void and invalid in its entirety"].)

In contrast, an action for fraud seeking tort damages " ' "is not 'on a contract' for purposes of an attorney fee award, even though the underlying transaction in which the fraud occurred involved a contract containing an attorney fee clause." ' " (*Orozco*, *supra*, 36 Cal.App.5th at p. 408.)  "However, where the plaintiff's claim instead seeks rescission based on fraud, the courts have concluded such claim does sound in contract" for purposes of an award of attorney fees under section 1717.  (*Super 7 Motel Associates*, *supra*, 16 Cal.App.4th at p. 549.)  Here, Siddiqui did not seek compensatory damages in tort for defendants' fraud.  She sought to rescind the auction contracts, based on false representations in the auction materials constituting the contracts, and she succeeded in doing so, which makes her action "on a contract."  (See *Star Pacific Investments, Inc. v. Oro Hills Ranch, Inc.* (1981) 121 Cal.App.3d 447, 461-463

[where a plaintiff elects the contract remedy of rescission for a defendant's fraud (intentional misrepresentation), the action is "on a contract" within the meaning of section 1717].)

As we explained above, there is nothing legally inconsistent or impermissible about a plaintiff electing the contract remedy of rescission on a fraud cause of action and also recovering punitive damages for the defendant's fraud. (*Horn*, *supra*, 270 Cal.App.2d at p. 484.) Similarly, there is nothing legally inconsistent or impermissible about Siddiqui recovering punitive damages for defendants' fraud and also recovering attorney fees under section 1717 because the fraud action is "on a contract." We are aware of no authority holding to the contrary.

  b.  *The present action is distinguishable from fraudulent inducement of contract actions in which interpretation of contract terms was not central to the trial court's resolution of the action*

An action for fraudulent inducement of a contract that does not require the trial court to interpret or enforce any of the contract's terms may not be "on a contract" for purposes of section 1717. (See *Orozco*, *supra*, 36 Cal.App.5th at p. 409 [the plaintiffs were not entitled to attorney fees under section 1717 where the "key question at trial was whether [one of the defendants] induced [one of the plaintiffs] to enter into the long-term lease," and the plaintiffs did not argue that that defendant "had breached the lease in any way," and the "action did not seek to interpret or enforce any provision in the lease or guaranty"].)

At oral argument, defendants cited *Reyes*, *supra*, 76 Cal.App.5th 596, a fraudulent inducement of contract case which is distinguishable. There, the plaintiffs filed an action alleging,

31

among other things, that they had sought to rescind a retail installment sales contract for a used automobile on the ground the salesperson made oral misrepresentations about the condition of the vehicle which induced them to sign the contract. (*Id*. at p. 602.) In addition to the oral representations, their causes of action for fraud and negligent misrepresentation were based on the implied warranty of merchantability arising by operation of law. (*Id*. at p. 619.) The plaintiffs brought a motion for attorney fees before trial, after accepting the defendant's offer to compromise under Code of Civil Procedure section 998, so the appellate court's analysis was based on the allegations of the operative complaint. (*Id*. at pp. 601-603.) The Court of Appeal concluded the plaintiffs' fraud and negligent misrepresentation causes of action, as alleged, were not "on a contract" within the meaning of section 1717, citing the general principle that a "cause of action for fraudulent inducement is not 'on the contract' for purposes of section 1717." (*Id*. at p. 621.) The plaintiffs' causes of action, as pleaded, would not have required an interpretation of the terms of the contract in determining the defendant's liability for fraud and negligent misrepresentation.

Here, in contrast, Siddiqui claimed defendants made misrepresentations in the auction contracts themselves, entitling her to rescission of the contracts. Siddiqui also had to overcome all of the defense arguments, at summary judgment and at trial, seeking to enforce provisions in the auction contracts which the defendants contended defeated her request to rescind the contracts. After considering the evidence presented at the bench trial, the trial court interpreted the provisions of the auction contracts in Siddiqui's favor.

In resolving the issue here, we follow the general principle that where an action " 'arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement,' " it is "on a contract." (*Orozco*, *supra*, 36 Cal.App.5th at p. 408.) Thus, we conclude Siddiqui's action is on a contract.

   c.  *An award of attorney fees here is consistent with the purpose of section 1717 to establish mutuality of remedy*

"The courts have consistently held that the award of Civil Code section 1717 contractual attorney's fees is to be governed by equitable principles." (*Jones v. Drain* (1983) 149 Cal.App.3d 484, 489-490 ["prevailing defendant sued for breach of contract containing an attorney's fees provision and having had to defend the contract cause of action is entitled to recover its own attorney's fees and costs therefor, even though the trial court finds no contract existed"].) A conclusion that this action is "on the contract" is both equitable and consistent with the "purpose underlying section 1717," which is " 'to establish mutuality of remedy where [a] contractual provision makes recovery of attorney's fees available for only one party [citations], and to prevent oppressive use of one-sided attorney's fees provisions.' " (*Hsu*, *supra*, 9 Cal.4th at p. 870.) "Nothing in section 1717 suggests an intent to punish a party by awarding attorney fees; its intent is to make reciprocal any contractual right to attorney fees." (*Marina Glencoe, L.P. v. Neue Sentimental Film AG* (2008) 168 Cal.App.4th 874, 879.)

Had Siddiqui sought to cancel the auction contracts before she wired the money, and defendants sued her to collect, or if they had sued for a declaratory judgment seeking to collect the

percent penalties in their contract as a condition to refunding her money, surely they would have asserted a right to recover attorney fees based on the contract. Precluding Siddiqui from recovering her attorney fees under the circumstances presented here, simply because she was forced to commence the litigation as a result of having been induced to send defendants her payment before discovering the fraud, would be inequitable and contravene the purpose underlying section 1717 of mutuality of remedy.

Because Siddiqui's action is "on the contract," and there can be no dispute that she is the prevailing party, she is entitled to attorney fees under section 1717. We reverse the trial court's order denying Siddiqui's motion for attorney fees and remand the matter for a determination of the amount of attorney fees to award her.

## DISPOSITION

The portion of the judgment awarding $94,789 in prejudgment interest is reversed, and the matter is remanded for the trial court to recalculate prejudgment interest from April 18, 2016 to October 26, 2021, at a rate of 7 percent, and to exercise its discretion in deciding whether to award simple or compound interest. In all other respects, the judgment is affirmed. The postjudgment order denying Siddiqui's motion for attorney fees is reversed, and the matter is remanded for the trial court to determine the amount of attorney fees to award Siddiqui under

34

Civil Code section 1717.  Each side is to bear its own costs on appeal.

NOT TO BE PUBLISHED


KELLEY, J.*

We concur:


ROTHSCHILD, P. J.


BENDIX, J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.